1  Rune Kraft
   rk@kraft.legal
2  Kraft Legal | United States
3  108 West 13th Street
  Wilmington, Delaware 19801
4    302 408 1000

5

6

7  UNITED STATES DISTRICT COURT

       NORTHERN DISTRICT OF CALIFORNIA
8          SAN FRANCISCO DIVISION

9                  CV22   1266

10 RUNE KRAFT,                                    Case No.

11        Plaintiff,                          **COMPLAINT**

12     v.

13 WELLS FARGO & COMPANY, WELLS
  FARGO BANK, NATIONAL ASSOCIATION,
14 RICHARD M. KOVACEVICH, JOHN G.
  STUMPF, TIMOTHY J. SLOAN,  CHARLES
15 W. SCHARF, CHARLES H. NOSKI, MARY
  T. MACK, ELIZABETH A. DUKE, STEPHEN
16 W. SANGER, CARRIE L. TOLSTEDT,
  JAMES M. STROTHER, KEVIN MCCABE,
17 DAVID M. JULIAN, PHILIP J. QUIGLEY,
  ENRIQUE HERNANDEZ, JR., LLOYD H.
18 DEAN, FEDERICO F. PEÑA, JOHN D.
  BAKER, II, JAMES H. QUIGLEY, RONALD
19 L. SARGENT, and DOES 1-10, Inclusive.
20
21      Defendants.
22

23

24

25

26

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................ 1

JURISDICTION AND VENUE ...................................................... 1

INTRADISTRICT ASSIGNMENT .............................................. 2

THE PARTIES ............................................................................... 3

STATEMENT OF FACTS ............................................................. 16

1. The RICO Persons ................................................................. 16

2. The Proceeds From Racketeering ......................................... 16

    2.1   Wells Fargo's Retail Branch Network Was Supercharged With Racketeering Proceeds From the Federal Reserve............ 16

    2.2   Then, the Overloaded Bank Branches Were Organized and Operated To Generate More Racketeering Proceeds.......... 20

    2.3   The Outcome Was Specified Unlawful Activity and Criminally Derived Property ............................................ 23

3. The Pattern of Racketeering Activity ..................................... 24

4. The RICO Enterprises ............................................................. 47

    4.1   The Wells Fargo & Company RICO Enterprise ............... 47

    4.2   The Wells Fargo Bank RICO Enterprise .......................... 48

    4.3   The Wells Fargo Associated-In-Fact RICO Enterprise ........... 48

    4.4   The Use of the Racketeering Proceeds At Wells Fargo & Company ................................................ 48

    4.5   The Use of the Racketeering Proceeds At Wells Fargo Bank.... 61

    4.6   Wells Fargo & Company Maintained Control Over Wells Fargo Bank Through A Pattern of Racketeering Activity ......... 74

5. Since At Least 2002, the Defendants Have Used Their Money and Power to Infiltrate and Corrupt Legitimate Business, Labor Standards, Capital Markets and to Subvert and Corrupt Our Branches of Government ............................................ 77

    5.1   The RICO Enterprises and the Executive Branch ............ 129

    5.2   The RICO Enterprises and the Judicial Branch .................. 129

    5.3   The RICO Enterprises and the Legislative Branch ............... 154

i

6.  Declaration of Plaintiff…………………………………...…….….…… 163

    6.1  The Six Unauthorized Accounts…………..………......…… 163

    6.2  The Fraudulent Concealment Before Discovery by Regulators.. 165

    6.3  The Waivers Based on Acts After Discovery by Regulators…... 171

        6.3.1  The Consent Orders…………………………………. 171

        6.3.2  The Testimonies Before Congress…………….……... 178

        6.3.3  The Moving Forward to Make Things Right Pledge….. 180

        6.3.4  The Make Things Right Regardless of Time Promise… 182

    6.4  The Fraudulent Concealment After Discovery By Regulators.... 185

    6.5  The Office of Comptroller of the Currency Action……………. 210

7.  The Defendants Are Prevented From Acting Contradictory to What They Have Previously Guaranteed or Established Via Their Conduct.. 218

    7.1  Plaintiff Acted Diligently, In Good Faith, and the Interests of Justice Require That He Not Be Barred From Pursuing His Claim………………………………………………….……. 220

    7.2  Plaintiff Was Induced or Tricked By His Adversaries Misconduct Into Allowing The Filing Deadline to Pass………. 221

    7.3  Waivers………….…………………………….……........…... 221

    7.4  Equitable Tolling………………………….………………… 222

    7.5  Equitable Estoppel……………………………….…....…… 223

    7.6  Fraudulent Concealment…………………………………… 225

    7.7  Continuing Tort and Conspiracy…………………....……….. 226

    7.8  Another Ongoing Action…………………….…………….... 226

8.  Defendants' Conduct Caused New Injuries to Plaintiff…………..….. 227

9.  Nothing Has Changed at Wells Fargo…………………………….….. 227

10. Plaintiff's Injuries From the Use of the Racketeering Proceeds at Wells Fargo & Company …………….………….…....…………….. 235

11. Plaintiff's Injuries From the Use of the Racketeering Proceeds at at Wells Fargo Bank, N.A.………………….…….……………….... 235

12. Plaintiff's Injuries From the Control of Wells Fargo Bank, N.A…….. 236

13. Plaintiff's Injuries From the Predicate Acts………………………... 237

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

COUNT ONE, VIOLATION OF 18 U.S.C. § 1962(a) ……….…....…….. 237
COUNT TWO, VIOLATION OF 18 U.S.C. § 1962(b) …………….….... 238
COUNT THREE, VIOLATION OF 18 U.S.C. § 1962(c) …....…….….... 238
COUNT FOUR, VIOLATION OF 18 U.S.C. § 1962(d) ………....….….. 238
RELIEF SOUGHT …………………………………………..…....….. 239

iii

# INTRODUCTION

1. This Complaint shows that (1) the Defendants' enterprises and associated-in-fact enterprise are a highly sophisticated, diversified, and widespread activity that warps America's economy by unlawful conduct and the illegal use of fraud, and corruption; (2) their organized crime derives a major portion of its power through money obtained from such illegal endeavors as wire fraud, bank fraud, money laundering, conspiracy to commit money laundering and obstruction of justice, and other forms of social exploitation; (3) this money and power is used to infiltrate and corrupt legitimate business and labor standards and to subvert and corrupt our branches of government; (4) their organized crime activities weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, and undermine the general welfare of the Nation and its citizens; and (5) the Racketeer Influenced Corrupt Organizations Act is being applied to bear on the unlawful activities because the sanctions and remedies available under the statutory framework are appropriate in scope and impact.

# JURISDICTION AND VENUE

2. This is an action for civil relief under the Racketeer Influenced Corrupt Organizations ("RICO") Act. 18 U.S.C. §§ 1961 et seq.

3. The controversy is a federal question, and the district court has original jurisdiction pursuant to 28 U.S.C. § 1331.

4. Since the parties hereto are citizens of different states, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $ 75,000, this court also has subject- matter jurisdiction pursuant to 28 U.S.C. § 1332.

5. A RICO action may be brought in any district in which a defendant resides, is found, has an agent or transacts its affairs, or where the general venue statute is satisfied. 18 U.S.C. § 1965 (a). A corporate defendant "resides" in any district where it is subject to personal jurisdiction. 28 U.S.C. § 1391(c). Wells Fargo & Company has its principal place of business in San Francisco, California and misconduct occurred in significant part in California.

6. Venue is proper in this district pursuant to 18 U.S.C. §1965(a), 28 U.S.C. §1391(b), and 28 U.S.C. §1391 because Wells Fargo & Company, is found, does business and transacts business within this district, and Defendants conduct the interstate trade and commerce described below in substantial part within this district.

7. This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§1965(b) and (d). Also, this district court has personal jurisdiction over all the out-of-state defendants because furtherance of the conspiracy described herein took place in California. 18 U.S.C. §§ 1956(a)(1), 1956(b)(2), 1956(h), 18 U.S.C. § 1956(i)(2).

8. During all or part of the period in which the events described in this Complaint occurred, each of the Defendants participated in a scheme to defraud Plaintiff in a continuous and uninterrupted flow of interstate commerce.

9. The activities of Defendants were within the flow of, and had a substantial effect on, interstate commerce.

## INTRADISTRICT ASSIGNMENT

10. This case is properly brought in the San Francisco Division of the Northern District of California. Pursuant to Local Rule 3-2(c), cases are to be filed in the Division "in which a substantial part of the events or omissions which give rise to the claim occurred." Defendant Wells Fargo & Company has its principal place of business in San Francisco. Wells Fargo's website, https://www.wellsfargo.com/help/addresses/, Securities and Exchange Commission filings from 2002 to 2020, https://www.sec.gov/edgar.shtml, and Annual Reports from 2002 to 2020, https://www.wellsfargo.com/about/investor-relations/annual-reports/ list the address of the bank's "Corporate Offices" as 420 Montgomery Street, which is less than two miles from this Court.

11. As Plaintiff alleges that Defendants have engaged in illegal activity related to Plaintiff's bank accounts and other financial products, and that such illegal activity was pursuant to nationwide policies, a substantial part of the events or omissions about which Plaintiff complains took place at Defendants' offices in San Francisco. Thus, pursuant to Local Rule 3-2(d), the proper venue for this case is the San Francisco Division of the Northern District of California.

# THE PARTIES

12. Plaintiff Rune Kraft ("Kraft") resides outside the United States and has several business offices, including in Wilmington, Delaware. He visits the United States to manage and develop businesses and assets.

13. Defendant Wells Fargo & Company is a corporation organized under the laws of Delaware and a financial holding company and a bank holding company registered under the Bank Holding Company Act of 1956, as amended. Its principal business is to act as a holding company for its subsidiaries. It is the parent, meaning the owner of Wells Fargo Bank, National Association. Wells Fargo Bank, N.A. comprises about 90% of the Company's assets. Its principal executive offices are located at 420 Montgomery Street, San Francisco, California 94163. *See* ¶ 10.

14. Defendant Wells Fargo Bank, National Association is a national banking association and has its headquarters at 101 N Phillips Ave, Sioux Falls, SD, 57104. 1 U.S.C. § 1 states that in determining the meaning of any Act of Congress, unless the context indicates otherwise, the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals. The Defendant is responsible for the nationwide activities of the bank, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Its role in the fraudulent schemes alleged herein is that it either ordered, participated in, or turned a blind eye to the unlawful activities and has allowed the continued use of the resources of the bank to support the fraudulent scheme. It has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Wells Fargo has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by Wells Fargo, members of the conspiracy, to further the crimes described herein. Wells Fargo & Company and Wells Fargo Bank, N.A. are collectively referred to herein as Wells Fargo.

15. Defendant Richard M. Kovacevich was the CEO of Wells Fargo & Company from at least 2002 to 2006, and the Chairman of the Board of Directors of Wells Fargo & Company from at least 2002 to 2008. He was responsible for the nationwide activities of Wells Fargo, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Kovacevich has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

16. Defendant John G. Stumpf headed the Community Bank, the retail bank of Wells Fargo, during the period since at least 2002 to 2006, he was the CEO of Wells Fargo & Company from 2007 to 2016, and the Chairman of the Board of Directors of Wells Fargo & Company from 2009 to 2016. He was responsible for the nationwide activities of Wells Fargo, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Stumpf has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or

4

indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

17. Defendant Timothy J. Sloan was part of the senior management team of Wells Fargo & Company since at least 2002 to 2018. He was the Chief Financial Officer of Wells Fargo & Company from 2010 to 2013, the CEO of Wells Fargo & Company during the period 2017 – 2018, and a member of the Board of Directors of Wells Fargo & Company from 2016 to 2018. Among other things, he was responsible for financial reporting, the preparation of annual reports and 10Ks and the nationwide activities of Wells Fargo, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Sloan has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

18. Defendant Charles W. Scharf is currently the CEO and a member of the Board of Directors of Wells Fargo & Company; positions he has occupied since 2019. Among other things, Wells Fargo has since October 2016 promised to make things right, including on Feb.21, 2019 (Predicate act 47), promises that have been a sham. And related this action, Mr. Scharf has either ordered, participated in, or turned a blind eye to the use of the bank's resources to obstruct Plaintiff's efforts to obtain the relief he has requested. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly

5

employed by the bank as contractors. Mr. Scharf has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

19. Defendant Charles H. Noski is currently the Chairman of the Board of Directors of Wells Fargo & Company, since 2020, and he has been a member of the Board of Directors since 2019. Among other things, Wells Fargo has since October 2016 promised to make things right, including on Feb.21, 2019 (Predicate act 47), promises that have been a sham. And related this action, Mr. Noski has either ordered, participated in, or turned a blind eye to the use of the bank's resources to obstruct Plaintiff's efforts to obtain the relief he has requested. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Noski has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

20. Defendant Mary T. Mack is currently the head of the Community Bank, a position she has held since 2016. Among other things, Wells Fargo has since October 2016 promised to make things right, promises that have been a sham. And related this action, Mr. Scharf has either ordered, participated in, or turned a blind eye to the use of the bank's resources to obstruct Plaintiff's efforts to obtain the relief he has requested. Her role in the fraudulent schemes alleged herein is that she either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and allowed the continued use of the resources of the bank to support the fraudulent

6

scheme. She has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Ms. Mack has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

21. Defendant Elizabeth A. Duke was the Chair of the Board of Directors of Wells Fargo & Company from 2017 to 2019, and she was a member of the Board of Directors from 2014 to 2019. The bank's officers and directors are responsible for the nationwide activities of Wells Fargo, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Her role in the fraudulent schemes alleged herein is that she either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the bank to support the fraudulent scheme. She has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Ms. Duke has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

22. Defendant Stephen W. Sanger was a member of the Board of Directors from 2003 to 2016, and he was the Chairman in 2016 of Wells Fargo & Company. The bank's officers and directors are responsible for the nationwide activities of Wells Fargo, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of

7

the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Sanger has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

23. Defendant Carrie L. Tolstedt was part of the Community Bank's leadership since at least 2002 and headed the Community Bank from 2005 to 2015. She was responsible for the nationwide activities of Wells Fargo's Community Bank, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. Her role in the fraudulent schemes alleged herein is that she either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and allowed the continued use of the resources of the bank to support the fraudulent scheme. She has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Ms. Tolstedt has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

24. Defendant James M. Strother was the General Counsel for Wells Fargo & Company from 2003 to 2016. The bank's officers and directors are responsible for the nationwide activities of Wells Fargo, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the bank to support the fraudulent scheme. He has

thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Strother has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

25. Defendant Kevin McCabe was the Chief Auditor for Wells Fargo & Company from 2002 to 2011. The bank's officers and directors are responsible for the nationwide activities of Wells Fargo, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. McCabe has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

26. Defendant David M. Julian was the Chief Auditor for Wells Fargo & Company from 2012 to 2017. He was the Chief Market Risk Officer in 2011. The bank's officers and directors are responsible for the nationwide activities of Wells Fargo, including establishing and maintaining the standards that ensure compliance with all applicable laws, at all times. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who

9

committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Julian has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

27. Defendant Philip J. Quigley was a member of Wells Fargo & Company's Board of Directors from 2002 to 2012, and he was a member of the Board's Audit and Examination Committee from 2002 to 2012. This Committee has several particular responsibilities, including overseeing: the integrity of the bank's financial statements and the adequacy and reliability of disclosures to shareholders and bank regulatory agencies, including management activities related to accounting and financial reporting and internal controls;  the qualifications and independence of the bank's independent registered public accounting firm and the activities and performance of the independent auditor and the internal audit function; the bank's  compliance with legal and regulatory requirements; and reputation risk related to the Committee's responsibilities described in the Charter. In addition, the Committee (i) reviews and approves the Committee report included in the Company's annual proxy statement in accordance with Securities and Exchange Commission rules, (ii) may perform the audit committee functions specified by 12 C.F.R. Part 363 for depository institution subsidiaries of the bank, and (iii) may perform the functions of a fiduciary audit committee required by 12 C.F.R. §9.9 for national bank subsidiaries of the bank with authorized fiduciary powers. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Quigley has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C.

10

§ 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein

28. Defendant Enrique Hernandez, Jr. was a member of Wells Fargo & Company's Board of Directors from 2002 to 2017, and he was a member of the Board's Audit and Examination Committee from 2002 to 2014. This Committee has several particular responsibilities, including overseeing: the integrity of the bank's financial statements and the adequacy and reliability of disclosures to shareholders and bank regulatory agencies, including management activities related to accounting and financial reporting and internal controls; the qualifications and independence of the bank's independent registered public accounting firm and the activities and performance of the independent auditor and the internal audit function; the bank's compliance with legal and regulatory requirements; and reputation risk related to the Committee's responsibilities described in the Charter. In addition, the Committee (i) reviews and approves the Committee report included in the Company's annual proxy statement in accordance with Securities and Exchange Commission rules, (ii) may perform the audit committee functions specified by 12 C.F.R. Part 363 for depository institution subsidiaries of the bank, and (iii) may perform the functions of a fiduciary audit committee required by 12 C.F.R. §9.9 for national bank subsidiaries of the bank with authorized fiduciary powers. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Hernandez has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

11

29. Defendant Lloyd H. Dean was a member of Wells Fargo & Company's Board of Directors from 2005 to 2017, and he was a member of the Board's Audit and Examination Committee from 2005 to 2010. This Committee has several particular responsibilities, including overseeing: the integrity of the bank's financial statements and the adequacy and reliability of disclosures to shareholders and bank regulatory agencies, including management activities related to accounting and financial reporting and internal controls; the qualifications and independence of the bank's independent registered public accounting firm and the activities and performance of the independent auditor and the internal audit function; the bank's compliance with legal and regulatory requirements; and reputation risk related to the Committee's responsibilities described in the Charter. In addition, the Committee (i) reviews and approves the Committee report included in the Company's annual proxy statement in accordance with Securities and Exchange Commission rules, (ii) may perform the audit committee functions specified by 12 C.F.R. Part 363 for depository institution subsidiaries of the bank, and (iii) may perform the functions of a fiduciary audit committee required by 12 C.F.R. §9.9 for national bank subsidiaries of the bank with authorized fiduciary powers. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Dean has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

30. Defendant Federico F. Peña was a member of Wells Fargo & Company's Board of Directors from 2011 to 2017, and he was a member of the Board's Audit and Examination Committee from 2011 to 2017. This Committee has several particular responsibilities, including overseeing: the integrity of the bank's financial statements and the adequacy and reliability of

disclosures to shareholders and bank regulatory agencies, including management activities related to accounting and financial reporting and internal controls;  the qualifications and independence of the bank's independent registered public accounting firm and the activities and performance of the independent auditor and the internal audit function; the bank's  compliance with legal and regulatory requirements; and reputation risk related to the Committee's responsibilities described in the Charter. In addition, the Committee (i) reviews and approves the Committee report included in the Company's annual proxy statement in accordance with Securities and Exchange Commission rules, (ii) may perform the audit committee functions specified by 12 C.F.R. Part 363 for depository institution subsidiaries of the bank, and (iii) may perform the functions of a fiduciary audit committee required by 12 C.F.R. §9.9 for national bank subsidiaries of the bank with authorized fiduciary powers. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Peña has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

31. Defendant John D. Baker, II was a member of Wells Fargo & Company's Board of Directors from 2008 to 2019, and he was a member of the Board's Audit and Examination Committee from 2008 to 2019. This Committee has several particular responsibilities, including overseeing: the integrity of the bank's financial statements and the adequacy and reliability of disclosures to shareholders and bank regulatory agencies, including management activities related to accounting and financial reporting and internal controls;  the qualifications and independence of the bank's independent registered public accounting firm and the activities and performance of the independent auditor and the internal audit function; the bank's  compliance with legal and

13

regulatory requirements; and reputation risk related to the Committee's responsibilities described in the Charter. In addition, the Committee (i) reviews and approves the Committee report included in the Company's annual proxy statement in accordance with Securities and Exchange Commission rules, (ii) may perform the audit committee functions specified by 12 C.F.R. Part 363 for depository institution subsidiaries of the bank, and (iii) may perform the functions of a fiduciary audit committee required by 12 C.F.R. §9.9 for national bank subsidiaries of the bank with authorized fiduciary powers. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Baker has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

32. Defendant James H. Quigley was a member of Wells Fargo & Company's Board of Directors from 2013 to 2019, and he was a member of the Board's Audit and Examination Committee from 2013 to 2019. This Committee has several particular responsibilities, including overseeing: the integrity of the bank's financial statements and the adequacy and reliability of disclosures to shareholders and bank regulatory agencies, including management activities related to accounting and financial reporting and internal controls; the qualifications and independence of the bank's independent registered public accounting firm and the activities and performance of the independent auditor and the internal audit function; the bank's compliance with legal and regulatory requirements; and reputation risk related to the Committee's responsibilities described in the Charter. In addition, the Committee (i) reviews and approves the Committee report included in the Company's annual proxy statement in accordance with Securities and Exchange Commission rules, (ii) may perform the audit committee functions specified by 12 C.F.R. Part

14

363 for depository institution subsidiaries of the bank, and (iii) may perform the functions of a fiduciary audit committee required by 12 C.F.R. §9.9 for national bank subsidiaries of the bank with authorized fiduciary powers. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and has allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Quigley has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein..

33. Defendant Ronald L. Sargent was a member of Wells Fargo & Company's Board of Directors from 2017 to 2020, and he was a member of the Board's Audit and Examination Committee from 2017 to 2020. This Committee has several particular responsibilities, including overseeing: the integrity of the bank's financial statements and the adequacy and reliability of disclosures to shareholders and bank regulatory agencies, including management activities related to accounting and financial reporting and internal controls;  the qualifications and independence of the bank's independent registered public accounting firm and the activities and performance of the independent auditor and the internal audit function; the bank's  compliance with legal and regulatory requirements; and reputation risk related to the Committee's responsibilities described in the Charter. In addition, the Committee (i) reviews and approves the Committee report included in the Company's annual proxy statement in accordance with Securities and Exchange Commission rules, (ii) may perform the audit committee functions specified by 12 C.F.R. Part 363 for depository institution subsidiaries of the bank, and (iii) may perform the functions of a fiduciary audit committee required by 12 C.F.R. §9.9 for national bank subsidiaries of the bank with authorized fiduciary powers. His role in the fraudulent schemes alleged herein is that he either ordered, participated in, or turned a blind eye to the unlawful activities alleged herein and

has allowed the continued use of the resources of the bank to support the fraudulent scheme. He has thus aided and abetted the persons who committed the crimes, frauds, and fraudulent schemes, whether they are or have been directly employed by the bank or indirectly employed by the bank as contractors. Mr. Sargent has acted as in agreement with at least one other person who committed the predicate acts described as "specified unlawful activity" listed in section 18 U.S.C. § 1961(1), which qualifies as a conspiracy by the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. This complaint describes with particularity numerous overt acts taken by persons either directly or indirectly employed by the bank, members of the conspiracy, to further the crimes described herein.

## STATEMENT OF FACTS

### 1. The RICO Persons.

34. 18 U.S.C. § 1961(3) defines a culpable "person" as an "entity capable of holding a legal or beneficial interest in property." All the Defendants in this action can hold a legal or beneficial interest in property. Accordingly, all the Defendants are RICO persons. *See* ¶¶ 13 – 33.

### 2. The Proceeds From Racketeering.

#### 2.1 Wells Fargo's Retail Branch Network Was Supercharged With Racketeering Proceeds From the Federal Reserve System.

35. Defendant Wells Fargo & Company is a financial holding company and a bank holding company registered under the Bank Holding Company Act of 1956, 12 U.S. Code Title 12, Chapter 17. In its filings with the Securities and Exchange Commission ("SEC") it represents that holding company means "the Parent" and any references to "we," "our," "us" or "the Company" mean the holding company and its subsidiaries that are consolidated for financial reporting purposes.

36. In its latest filing with the SEC, Wells Fargo & Company represented that it "has approximately $1.9 trillion in assets, proudly serves one in three U.S. households and more than 10% of small businesses in the U.S., and is the leading middle market banking provider in the

U.S. We provide a diversified set of banking, investment and mortgage products and services, as well as consumer and commercial finance, through our four reportable operating segments: Consumer Banking and Lending, Commercial Banking, Corporate and Investment Banking, and Wealth and Investment Management. Wells Fargo ranked No. 37 on Fortune's 2021 rankings of America's largest corporations. We ranked fourth in assets and third in the market value of our common stock among all U.S. banks at September 30, 2021." [1]  It is obvious from these facts that the activities of Defendants Wells Fargo & Company and Wells Fargo Bank affect interstate or foreign commerce.

37. Wells Fargo Bank maintained bank accounts at one or more of the Federal Reserve System's twelve regional Federal Reserve Banks ("FRBs"). The balances in these accounts are called "reserves." [2]  Banks are required by Congress and by the Federal Reserve Board to maintain certain minimum amounts of reserves in their accounts. *See* 12 U.S.C. § 461 (establishing "reserve requirements"). Reserve requirements may also be satisfied with cash (*i.e.,* Federal Reserve notes), which is functionally equivalent to reserve balances; reserve balances and cash are the two components of "base money" (also called the monetary base).[3] Both types of base money are *liabilities,* not assets, of the FRBs. (For ordinary private-sector banks, base money can only be an asset not a liability.) In other words, the FRBs are the issuers of base money. They do not lend out preexisting funds; they create "funds" in the most elemental sense. They perform this function on behalf of the United States, as federal instrumentalities. When banks request loans from the FRBs, the FRBs extend those loans by increasing these reserves, *e.g.*, when the Fed

---

[1] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2021/third-quarter-10q.pdf

[2] While paper currency may be held by anyone, reserve balances may be maintained only by banks and governmental entities. *See, e.g.,* 12 U.S.C. § 342 (authorizing FRBs to maintain accounts for member banks, other depository institutions, and the U.S. Treasury Department); *id.* at § 391 (authorizing FRBs to maintain accounts for government-sponsored enterprises in the residential mortgage business); *id.* at §§ 1435, 1452(d), 1723a(g) (authorizing FRBs to maintain accounts for foreign governments, foreign banks, and central banks); *id.* at §§ 347d & 358 (authorizing FRBs to maintain accounts for the International Monetary Fund and the World Bank).

[3] *See* Board of Governors of the Federal Reserve System, Aggregate Reserves of Depository Institutions and the Monetary Base-H.3, Table 2, available at https://www.federalreserve.gov/releases/h3/current.

makes a $10 billion loan to a bank, the bank is credited with $10 billion of reserves. No preexisting source of funds exists. Crediting the loan amount to the borrowing bank's reserve account creates new reserves, increasing the overall level of reserves in the banking system by exactly the amount lent. These new reserves are created *ex nihilo,* at a keystroke. They are promises by the FRBs to pay Federal Reserve notes (dollar bills) to the banks on demand. The FRBs' promises to pay notes serve as money or legal tender because they must be accepted by the Treasury and by other banks as payment. The U.S. Constitution grants this power on Congress. *See* U.S. Constitution, Article I, § 8, cl. 5 ("The Congress shall have Power ... To coin Money, regulate the Value thereof..."); *see also Knox v. Lee,* 79 U.S. (12 Wall.) 457, 565-66, 20 S.Ct. 287 (1871) (describing that it "is undoubtedly the public law of this country" that Congress determines the standard of money and what instruments may pass as legal tender).[4]  Had Congress not assigned this power to the Fed, the FRBs would be unable to extend the loans to Wells Fargo. Thus, the United States is the source of the purchasing power bestowed on the banks when they borrow from the Fed's lending facilities. The loans are also money provided by the United States in a further sense. The Board puts Federal reserve notes into circulation by supplying them to the FRBs, which are the actual direct issuers. *See* 12 U.S.C. §§ 411-12. [5] Thus, when banks withdraw the proceeds of loans

---

[4] *Knox v. Lee* traces the state's prerogative back to *The Case of Mixed Money,* Davies Rep. 48 (1605), *reprinted in* 2 Cobbett's State Trials, 118 (1809) ("the king by his prerogative may make money of what matter and form he pleaseth, and establish the standard of it, so may he change his money in substance and impression, and enhance or debase the value of it, or entirely decry and annul it"); *id.* at 116 ("no other person" may make money "without special license or commandment of the king").

[5] Federal law recognizes two types of legal tender in the United States: "United States coins" and "Federal reserve notes." 31 U.S.C. § 5103; *see also* 12 U.S.C. § 411. The Treasury Department physically creates both. *See* 31 U.S.C. § 304; *id.* at § 5114; *id.* at § 303, 12 U.S.C. § 418. However, while the Treasury Department determines the supply of United States coins, 31 U.S.C. § 5111(a)(1) ("The Secretary of the Treasury ... shall mint and issue coins... in amounts the Secretary decides are necessary to meet the needs of the United States"), the Board controls the supply of notes, 12 U.S.C. § 411 ("Federal reserve notes, to be issued at the discretion of the Board ... are hereby authorized"); *id.* at § 419. The Fed puts these notes into circulation by providing them to the FRBs which ultimately exchange them for financial assets held by the private sector. For example, the FRBs promise to pay notes to private banks in order to purchase from them debt securities of the United States issued by the Treasury Department. These private banks then

requested from (and extended by) the FRBs, the banks obtain money "provided" by the Board, *i.e.*, money made available and/or supplied by the United States.

38. Wells Fargo Bank committed bank fraud to secure funds from the FRBs, materially and overtly lying to the FRBs about its acts and practices and being in compliance with all laws and regulations, Wells Fargo Bank's loan requests from the FRBs were fraudulent.

39. Wells Fargo & Company maintained bank accounts at Wells Fargo Bank. The use of these accounts was intertwined with the operation of Wells Fargo Bank, which was based on racketeering proceeds. Plaintiff contends that since 2002 Wells Fargo & Company has on thousands of occasions withdrawn money from its bank accounts with Wells Fargo Bank knowingly executing a scheme to defraud a financial institution and using false or fraudulent pretenses to obtain property under the custody or control of a bank.

40. 18 U.S.C. §1344(1) makes it a crime to "knowingly execut[e] a scheme . . . to defraud a financial institution", and 18 U.S.C. §1344(2) makes criminal the use of "false or fraudulent pretenses" to obtain "property . . . under the custody or control of" a bank. In *Shaw v. United States*, 580 U. S. ___ (2016) the Court declared that "a scheme to defraud" demands neither a showing that the bank suffered ultimate financial loss nor a showing that the defendant intended to cause such loss.

41. The interactions between Wells Fargo Bank and the FRBs are clouded in secrecy. Plainly, the interactions and transactions are kept confidential. Therefore, related to this conduct, Plaintiff is invoking FRCP 11(b)(3), the related factual contentions will have evidentiary support after a reasonable opportunity for further investigation or discovery.

42. Plaintiff contends that since 2002 Wells Fargo Bank has on numerous occasions borrowed short-term funds from FRBs through the "Discount Window," and longer-term funds through the Term Auction Facility ("TAF"). The Discount Window loans were made at one of two interest rates: "primary," which carries a low interest rate; and "secondary," which carries a higher interest rate. Regulations governing the Discount Window provide that a bank is not

---

withdraw notes when they need physical currency. And, as relevant here, the FRBs are authorized to lend these notes to private banks when certain further requirements are met. *See id.* at §§ 341 *et seq.*

eligible for primary credit unless it is in generally sound financial condition. A complex evaluative mechanism exists to ascertain a bank's financial condition. If a bank is not eligible for primary credit, it may receive secondary credit (contingent upon its satisfaction of further requirements) that carries a higher interest rate and a shorter term. Plaintiff alleges that Wells Fargo Bank engaged in unsafe and unsound banking practices by opening bank accounts, which by law and company policy, necessitated authorization from the account holder. Instead of doing so, however, Plaintiff claims that as early as 2002, Wells Fargo Bank engaged in the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank. Plaintiff alleges that this fraud distorted Wells Fargo & Company's and Wells Fargo Bank's management ratings used by banking supervisors. Neither Wells Fargo & Company nor Wells Fargo Bank was "well managed". 12 U.S.C. § 1841(o)(9). Wells Fargo Bank fraudulently represented their eligibility for the loans and/or made explicit certifications that they were not violating any laws or regulations that could adversely affect their ability to perform their obligations in connection with the loans. These distortions made Wells Fargo eligible to participate in the Discount Window's lending program at the primary rate, as well as the TAF program.

43. As a result, Wells Fargo Bank received from FRBs loans at below-market primary rates for which they were not eligible. Had Wells Fargo Bank accurately represented its banking practices, Plaintiff claims that the FRBs would have reacted to the loan requests differently; *e.g.*, declared the bank ineligible, charged a higher rate, received more money for providing the loans, or deposited more money with the United States Treasury.

44. Wells Fargo Bank violated 18 U.S.C. §1344(1) as the conduct caused the Fed to make loans to the bank, knowingly executing a scheme to defraud a financial institution.

45. Wells Fargo Bank violated 18 U.S.C. §1344(2) as the conduct caused the Fed to make loans to the bank, intending to obtain bank property and obtaining bank property.

## 2.2 Then, the Overloaded Bank Branches Were Organized and Operated To Generate More Racketeering Proceeds.

46. During the period 2002 to 2005 home prices skyrocketed without any basis in the population, building costs and/or bond yields. Housing prices peaked in early 2006, started to

decline in 2006 and 2007, and reached new lows in 2012. On December 30, 2008, the Case–Shiller home price index reported its largest price drop in its history. The large decline in U.S. home prices led to mortgage delinquencies, foreclosures, and the devaluation of housing-related securities. These events had a cascading effect and contributed to the 2007-2008 global financial crisis. Declines in residential investment were followed by reductions in household spending and then business investment.

47. The U.S. Financial Crisis Inquiry Commission [6] reported its findings in January 2011:

> While the vulnerabilities that created the potential for crisis were years in the making, it was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages-—that was the spark that ignited a string of events, which led to a full-blown crisis in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world. When the bubble burst, hundreds of billions of dollars in losses in mortgages and mortgage-related securities shook markets as well as financial institutions that had significant exposures to those mortgages and had borrowed heavily against them. This happened not just in the United States but around the world. The losses were magnified by derivatives such as synthetic securities.

48. It concluded that "the crisis was avoidable and was caused by:

- widespread failures in financial regulation, including the Federal Reserve's failure to stem the tide of toxic mortgages;

- dramatic breakdowns in corporate governance including too many financial firms acting recklessly and taking on too much risk;

- an explosive mix of excessive borrowing and risk by households and Wall Street that put the financial system on a collision course with crisis;

- key policy makers ill prepared for the crisis, lacking a full understanding of the financial system they oversaw; and

- systemic breaches in accountability and ethics at all levels."

https://www.fdlp.gov/16-about/957-fcic-report

---

[6] The Financial Crisis Inquiry Commission (FCIC) was a ten-member commission appointed by the leaders of the United States Congress with the goal of investigating the causes of the financial crisis of 2007–2008.

49. Plaintiff alleges that Wells Fargo & Company and Wells Fargo Bank, along with Wachovia Bank and World Savings Bank (Golden West Financial), which merged into Wells Fargo, owned many toxic, low-grade assets, which, by law, necessitated that they hold considerable capital against them. Instead of doing so, however, Plaintiff claims that as early as 2002, Wells Fargo engaged in extensive accounting and control fraud that made them appear to be financially sound, sufficiently capitalized, and in compliance with applicable banking laws, when, in fact, none of that was the case. Plaintiff alleges that this fraud distorted Wells Fargo's supervisory ratings and capital ratios, and hid their serious undercapitalization.

50. Then, as Wells Fargo Bank received billions of dollars in racketeering proceeds from the FRBs, the proceeds were funneled to the bank's retail branch network, and the overloaded bank branches were organized and operated to generate more racketeering proceeds: Wells Fargo opened bank accounts which the account holders did not know about, did not authorize, or both.

51. Wells Fargo organized and ran its retail branch network by setting daily quotas for the number of new "solutions" (Wells Fargo calls its products solutions) that employees had to generate. The thinking was that the more banking products, the more opportunities the bank had to make money through fees, interest, and other transactions.

52. The consequence of this daily quota system was that retail branch employees engaged in fraudulent behavior, including just opening bank accounts *without the customer's authorization or knowledge*.

53. Wells Fargo enforced its retail branch network sales quotas by constant monitoring. The activities for each branch and each employee were reviewed by Wells Fargo's District Managers, multiple times every day. Employees who did not meet daily sales quotas were criticized by management or told to "do whatever it takes" to meet the quotas set for them. As a direct and expected result of this quota system, Wells Fargo knew its employees must engage in the illegal activity described herein.

54. Inside Wells Fargo the use of illegal practices was known as "gaming", which consisted of, among other things, opening and manipulating fee-generating customer accounts through fraudulent and unlawful means, such as omitting signatures and adding unwanted secondary accounts to primary accounts without permission.

55. Not only did Wells Fargo know of and encourage gaming, but its systems also enabled it. Wells Fargo maintained information systems that enabled access to the information needed to open new accounts which could then be used to create unauthorized accounts for customers without the customers' knowledge. Those employees then received credit for having "sold" a customer a new solution.

56. In essence, the employees at Wells Fargo's retail branch network were confronted with two options, choose between keeping their jobs and opening unauthorized accounts.

57. In reality, the opening of bank accounts had to comply with 31 CFR § 1020.220 (a)(1).

58. And Wells Fargo even had a policy consistent with the law, "Wells Fargo's Required Documents to Open an Account by Business Ownership Type".

59. However, in truth and in fact, this was merely window dressing at the bank's retail branch network.

60. In Section 6.1 herein Plaintiff provides the facts about six unauthorized accounts that Wells Fargo opened.

61. The funds that were deposited into the six unauthorized accounts were property under the custody of Wells Fargo Bank.

62. In *Loughrin* v. *United States,* 573 U. S. 351 (2014), the Supreme Court stated that 18 U.S.C. §1344(2) makes it a crime to knowingly execute a scheme to obtain such property "by means of false or fraudulent pretenses." And that it was irrelevant if the defendant intended to defraud a financial institution. Section 1344(2) requires only that the defendant intend to obtain such property and that this end is accomplished "by means of" a false statement.

63. Therefore, Wells Fargo Bank's conduct related to the six unauthorized accounts violated §1344(2): Wells Fargo Bank acquired the property "*by means of*" the misrepresentation that the accounts had been opened by the account holder in the federally insured bank.

### 2.3  The Outcome Was Specified Unlawful Activity and Criminally Derived Property.

64. The above detailed acts of bank fraud in violation of 18 U.S.C. §§ 1344(1) and (2) are listed in section 18 U.S.C. 1961(1).

COMPLAINT
Case No.

65. The federal money laundering statute, 18 U.S.C. § 1956, declares that the term "specified unlawful activity" means any act or activity constituting an offense listed in section 18 U.S.C. 1961(1) except an act which is indictable under subchapter II of chapter 53 of title 31. 18 U.S.C. §1956(c)(7)

66. Thus Wells Fargo's conduct related to the unauthorized bank accounts constituted specified unlawful activity.

67. And, the derived property is criminally derived property.

### 3. The Pattern of Racketeering Activity.

68. 18 U.S.C. § 1961(1) defines "racketeering activity" as any of the state and federal offenses listed therein, which are nine classes of state criminal felony laws, any act 'indictable' under sixty-five specific federal criminal provisions, any federal 'offense' involving bankruptcy or securities fraud, and any narcotics-related activities 'punishable' under federal law. These offenses are called "predicate acts" because at least one of them must have been committed to form a "pattern" pursuant to 18 U.S.C. § 1961(5).

69. A plaintiff need not allege that the defendant has been convicted of the predicate act to bring a civil claim. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 488-93 (1985).

70. A plaintiff needs only be injured by a single predicate act committed in furtherance of the scheme and may use predicate acts targeting other victims to show evidence of a "pattern" of racketeering. *Sedima, S.P.R.L.,* 473 U.S. at 488-93; *Deppe v. Tripp*, 863 F.2d 1356, 1366-67 (7th Cir. 1988); *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809-10 (7th Cir. 1987); *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1004 (7th Cir. 2004).

**Predicate Act 1**

71. On or about March 1, 2003, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley and Enrique Hernandez, Jr. caused Wells Fargo's 2002 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail

24

bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 2**

72. On or about March 1, 2003, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley and Enrique Hernandez, Jr. caused Wells Fargo's Form 10-K and 2002 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 3**

73. On or about March 1, 2004, the Defendants Wells Fargo, Richard M. Kovacevich,, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley and Enrique Hernandez, Jr. caused Wells Fargo's 2003 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 4**

74. On or about March 1, 2004, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley and Enrique Hernandez, Jr. caused Wells Fargo's Form 10-K and 2003 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and

25

overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 5**

75. On or about March 1, 2005, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr. and Lloyd H. Dean, caused Wells Fargo's 2004 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)


**Predicate Act 6**

76. On or about March 1, 2005, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr. and Lloyd H. Dean caused Wells Fargo's Form 10-K and 2004 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 7**

77. On or about March 1, 2006, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr. and Lloyd H. Dean caused Wells Fargo's 2005 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the

26

public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 8**

78. On or about March 1, 2006, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr. and Lloyd H. Dean caused Wells Fargo's Form 10-K and 2005 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 9**

79. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199180 causing fraudulent information to be sent by wire to the bank systems as the purported customer was not a customer because the corporation had not consented to open or issue the products. The false representations by employees enabled them to obtain benefits (or avoid negative consequences) for their managers or themselves, including sales credit, improved performance management outcomes, and incentive compensation. a. In opening or issuing such unauthorized accounts or products, employees knowingly entered customer identification information, such as EIN information, incorporation information, state corporation numbers, or other data, in bank computer systems without the customer's consent. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 10**

80. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells

27

Fargo's retail bank opened account no. 8708199180 knowingly executing a scheme to defraud a financial institution, as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(1))

**Predicate Act 11**

81. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199180 intending to obtain bank property and this end was accomplished by a false statement as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(2))

**Predicate Act 12**

82. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199180 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(a)).

**Predicate Act 13**

83. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199180 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Conspiracy to Commit Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(h)).

**Predicate Act 14**

28

84. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199198 causing fraudulent information to be sent by wire to the bank systems as the purported customer was not a customer because the corporation had not consented to open or issue the products. The false representations by employees enabled them to obtain benefits (or avoid negative consequences) for their managers or themselves, including sales credit, improved performance management outcomes, and incentive compensation. a. In opening or issuing such unauthorized accounts or products, employees knowingly entered customer identification information, such as EIN information, incorporation information, state corporation numbers, or other data, in bank computer systems without the customer's consent. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 15**

85. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199198 knowingly executing a scheme to defraud a financial institution, as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(1))

**Predicate Act 16**

86. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199198 intending to obtain bank property and this end was accomplished by a false statement as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(2))

**Predicate Act 17**

87. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199198 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(a)).

**Predicate Act 18**

88. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199198 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Conspiracy to Commit Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(h)).

**Predicate Act 19**

89. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199172 causing fraudulent information to be sent by wire to the bank systems as the purported customer was not a customer because the corporation had not consented to open or issue the products. The false representations by employees enabled them to obtain benefits (or avoid negative consequences) for their managers or themselves, including sales credit, improved performance management outcomes, and incentive compensation. a. In opening or issuing such unauthorized accounts or products, employees knowingly entered customer identification information, such as EIN information, incorporation information, state corporation numbers, or other data, in bank computer systems without the customer's consent. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 20**

30

90. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199172 knowingly executing a scheme to defraud a financial institution, as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(1))

**Predicate Act 21**

91. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199172 intending to obtain bank property and this end was accomplished by a false statement as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(2))

**Predicate Act 22**

92. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199172 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(a)).

**Predicate Act 23**

93. On January 18, 2007, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, Wells Fargo's retail bank opened account no. 8708199172 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or

31

attempted to be conducted with the intent to carry on specified unlawful activity. Conspiracy to Commit Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(h)).

**Predicate Act 24**

94. On or about March 1, 2007, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean caused Wells Fargo's 2006 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 25**

95. On or about March 1, 2007, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean caused Wells Fargo's Form 10-K and 2006 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 26**

96. On or about March 1, 2008, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II caused Wells Fargo's 2007 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers,

investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 27**

97. On or about March 1, 2008, the Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II caused Wells Fargo's Form 10-K and 2007 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 28**

98. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552991 causing fraudulent information to be sent by wire to the bank systems as the purported customer was not a customer because the corporation had not consented to open or issue the products. The false representations by employees enabled them to obtain benefits (or avoid negative consequences) for their managers or themselves, including sales credit, improved performance management outcomes, and incentive compensation. a. In opening or issuing such unauthorized accounts or products, employees knowingly entered customer identification information, such as EIN information, incorporation information, state corporation numbers, or other data, in bank computer systems without the customer's consent. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 29**

99. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James

33

M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552991 knowingly executing a scheme to defraud a financial institution, as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(1))

**Predicate Act 30**

100. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552991 intending to obtain bank property and this end was accomplished by a false statement as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(2))

**Predicate Act 31**

101. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552991 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(a)).

**Predicate Act 32**

102. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552991 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity.

34

Conspiracy to Commit Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(h)).

**Predicate Act 33**

103. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552983 causing fraudulent information to be sent by wire to the bank systems as the purported customer was not a customer because the corporation had not consented to open or issue the products. The false representations by employees enabled them to obtain benefits (or avoid negative consequences) for their managers or themselves, including sales credit, improved performance management outcomes, and incentive compensation. a. In opening or issuing such unauthorized accounts or products, employees knowingly entered customer identification information, such as EIN information, incorporation information, state corporation numbers, or other data, in bank computer systems without the customer's consent. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 34**

104. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552983 knowingly executing a scheme to defraud a financial institution, as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(1))

**Predicate Act 35**

105. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552983 intending to obtain bank

35

property and this end was accomplished by a false statement as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(2))

**Predicate Act 36**

106. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552983 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C.  § 1956(a)).

**Predicate Act 37**

107. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552983 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Conspiracy to Commit Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C.  § 1956(h)).

**Predicate Act 38**

108. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan,  Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552975 causing fraudulent information to be sent by wire to the bank systems as the purported customer was not a customer because the corporation had not consented to open or issue the products. The false representations by employees enabled them to obtain benefits (or avoid negative consequences) for their managers or themselves, including sales credit, improved performance management outcomes, and

36

incentive compensation. a. In opening or issuing such unauthorized accounts or products, employees knowingly entered customer identification information, such as EIN information, incorporation information, state corporation numbers, or other data, in bank computer systems without the customer's consent. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 39**

109. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552975 knowingly executing a scheme to defraud a financial institution, as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(1))

**Predicate Act 40**

110. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552975 intending to obtain bank property and this end was accomplished by a false statement as the purported customer was not a customer because the corporation had not consented to open or issue the products. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(2))

**Predicate Act 41**

111. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552975 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(a)).

**Predicate Act 42**

112. On April 28, 2008, and thus applicable to Defendants Wells Fargo, Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II, Wells Fargo's retail bank opened account no. 3062552975 knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Conspiracy to Commit Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(h)).

**Predicate Act 43**

113. On or about March 1, 2009, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II caused Wells Fargo's 2008 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 44**

114. On or about March 1, 2009, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II caused Wells Fargo's Form 10-K and 2008 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 45**

38

115. On or about March 1, 2010, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II caused Wells Fargo's 2009 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 46**

116. On or about March 1, 2010, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean and John D. Baker, II caused Wells Fargo's Form 10-K and 2009 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 47**

117. On or about March 1, 2011, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II and Federico F. Peña caused Wells Fargo's 2010 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 48**

39
COMPLAINT
Case No.

118. On or about March 1, 2011, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II and Federico F. Peña caused Wells Fargo's Form 10-K and 2010 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 49**

119. On or about March 1, 2012, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, David M. Julian, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II and Federico F. Peña caused Wells Fargo's 2011 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 50**

120. On or about March 1, 2012, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, David M. Julian, Philip J. Quigley, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II and Federico F. Peña caused Wells Fargo's Form 10-K and 2011 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 51**

121. On or about March 1, 2013, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña and James H. Quigley caused Wells Fargo's 2012 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 52**

122. On or about March 1, 2013, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña and James H. Quigley caused Wells Fargo's Form 10-K and 2012 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 53**

123. On or about March 1, 2014, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña, James H. Quigley and Elizabeth A. Duke, caused Wells Fargo's 2013 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 54**

124. On or about March 1, 2014, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña, James H. Quigley and Elizabeth A. Duke, caused Wells Fargo's Form 10-K and 2013 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 55**

125. On or about March 1, 2015, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña, James H. Quigley and Elizabeth A. Duke, caused Wells Fargo's 2014 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 56**

126. On or about March 1, 2015, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña, James H. Quigley and Elizabeth A. Duke, caused Wells Fargo's Form 10-K and 2014 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 57**

127. On or about March 1, 2016, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, James M. Strother, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña, James H. Quigley, Elizabeth A. Duke, and Mary T. Mack,caused Wells Fargo's 2015 annual report to be sent by wire to Wells Fargo's website. Nowhere in the annual report can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 58**

128. On or about March 1, 2016, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, James M. Strother, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña, James H. Quigley, Elizabeth A. Duke, and Mary T. Mack, caused Wells Fargo's Form 10-K and 2015 annual report to be sent by wire to the Securities and Exchange Commission in Washington D.C. Nowhere in the documents can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank, misleading Wells Fargo's regulators and overseers, investors, and the public in general about the unlawful activities in its largest business unit. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 59**

129. On September 1, 2016, the Defendants Wells Fargo, John G. Stumpf, Stephen W. Sanger, Enrique Hernandez, Jr., Lloyd H. Dean, Federico F. Peña and James H. Quigley, signed "Stipulation and consent to the issuance of a consent order" with the OCC and caused the document to be sent by wire to the OCC in San Francisco and/or Washington D.C. The promises made were a fraud. Obstruction of Justice. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1512(c)) Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343).

**Predicate Act 60**

130 On September 20, 2016 and thus applicable to Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, James M. Strother, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña, James H. Quigley, Elizabeth

43

A. Duke, and Mary T. Mack, Wells Fargo provided fraudulent statements to the U.S. Senate Committee on Banking, Housing and Urban Affairs as the testimony failed to incorporate: the August 2004 internal investigation report; that since 2005, the bank's Board received regular Audit & Security reports indicating the highest level of EthicsLine internal complaint cases, employee terminations, and were related to sales integrity violations; and the 2007 letter. Obstruction of Justice. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1512(c))

**Predicate Act 61**

131. In October 2016, the Defendants Wells Fargo, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, James M. Strother, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña, James H. Quigley, Elizabeth A. Duke, and Mary T. Mack, caused "Moving forward to make things right. Fixing what went wrong." to be sent by wire to Wells Fargo's website. The document was a Wells Fargo campaign following Mr. Stumpf's testimony. The promises made were a sham. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 62**

132. On or about April 10, 2017, the Defendants Wells Fargo, Timothy J. Sloan, David M. Julian, Enrique Hernandez, Jr., Lloyd H. Dean, John D. Baker, II, Federico F. Peña, James H. Quigley, Elizabeth A. Duke, Mary T. Mack and Ronald L. Sargent caused "Independent Directors of the Board of Wells Fargo & Company Sales Practices Investigation Report April 10, 2017"to be sent by wire to Wells Fargo's website. The report did not disclose that since 2005, the bank's Board received regular Audit & Security reports indicating the highest level of EthicsLine internal complaint cases, employee terminations, and were related to sales integrity violations. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 63**

133. On or about May 6, 2018, the Defendants Wells Fargo, Timothy J. Sloan, John D. Baker, II, James H. Quigley, Elizabeth A. Duke, Mary T. Mack and Ronald L. Sargent caused "Established 1852. Re-established 2018 with a recommitment to you." to be sent by wire to Wells Fargo's website. The document was a Wells Fargo campaign. The promises made were a sham. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)\

44

**Predicate Act 64**

134. On or about December 31, 2018, the Defendants Wells Fargo, Timothy J. Sloan, John D. Baker, II, James H. Quigley, Elizabeth A. Duke, Mary T. Mack and Ronald L. Sargent caused "Learning from the past, transforming for the future Business Standards Report, Wells Fargo & Company" to be sent by wire to Wells Fargo's website. The representations and promises made were a sham. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Predicate Act 65**

135. On or about February 21, 2019, the Defendants Wells Fargo, Charles W. Scharf, Charles H. Noski, John D. Baker, II, James H. Quigley, Elizabeth A. Duke, Mary T. Mack and Ronald L. Sargent caused "Wells Fargo's transformation. Progress as of Feb.21, 2019" to be sent by wire to Wells Fargo's website. The representations and promises made were a sham. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Group Predicate Acts Category 1**

136. Since 2002 Wells Fargo Bank has on numerous occasions borrowed short-term funds from FRBs through the "Discount Window," and longer-term funds through the Term Auction Facility knowingly executing a scheme to defraud a financial institution, as the bank was not eligible because of its banking practices. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(1))

**Group Predicate Acts Category 2**

137. Since 2002 Wells Fargo Bank has on numerous occasions borrowed short-term funds for which they were not eligible from FRBs through the "Discount Window," and longer-term funds through the Term Auction Facility intending to obtain bank property and this end was accomplished by misrepresenting its banking practices. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(2))

**Group Predicate Acts Category 3**

138. Since 2002 Wells Fargo Bank has on numerous occasions borrowed short-term funds for which they were not eligible from FRBs through the "Discount Window," and longer-term funds through the Term Auction Facility knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be

45

conducted with the intent to carry on specified unlawful activity. Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(a)).

**Group Predicate Acts Category 4**

139. Since 2002 Wells Fargo Bank has on numerous occasions borrowed short-term funds for which they were not eligible from FRBs through the "Discount Window," and longer-term funds through the Term Auction Facility knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Conspiracy to Commit Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(h)).

**Group Predicate Acts Category 5**

140. Since 2002 Wells Fargo Bank has on numerous occasions borrowed short-term funds from FRBs through the "Discount Window," and longer-term funds through the Term Auction Facility causing fraudulent information to be sent by wire to the FRBs as it was not eligible because of its banking practices. The false representations enabled it to receive billions of dollars in proceeds. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Group Predicate Acts Category 6**

141. Since 2002 Wells Fargo & Company has on numerous occasions sent by wire reports to New York Stock Exchange containing false and misleading information about its banking practices, compliance with laws, operational data, and financial statements, which violated the exchange's rules. Wire Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1343)

**Group Predicate Acts Category 7**

142. Since 2002 Wells Fargo & Company has on thousands of occasions withdrawn money from bank accounts with Wells Fargo Bank knowingly executing a scheme to defraud a financial institution, as the transactions were based on racketeering proceeds. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(1))

**Group Predicate Acts Category 8**

143. Since 2002 Wells Fargo & Company has on thousands of occasions withdrawn money from bank accounts with Wells Fargo Bank intending to obtain bank property and this end was

accomplished by false and fraudulent pretenses. Bank Fraud. 18 U.S.C. § 1961(1)(B) Predicate Acts (18 U.S.C. § 1344(2))

**Group Predicate Acts Category 9**

144. Since 2002 Wells Fargo & Company has on thousands of occasions withdrawn money from bank accounts with Wells Fargo Bank knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(a)).

**Group Predicate Acts Category 10**

145. Since 2002 Wells Fargo & Company has on thousands of occasions withdrawn money from bank accounts with Wells Fargo Bank knowing that the property involved represented the proceeds of specified unlawful activity, financial transactions were conducted or attempted to be conducted with the intent to carry on specified unlawful activity. Conspiracy to Commit Money Laundering. 18 U.S.C.§ 1961(1)(B) Predicate Acts (18 U.S.C. § 1956(h)).

**4. The RICO Enterprises.**

**4.1   The Wells Fargo & Company RICO Enterprise.**

146. Defendant Wells Fargo & Company is accused of violating 18 U.S.C. §§ 1962(a) and (b). Section 1962(a) prohibits the use of proceeds from racketeering to operate any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. And this complaint charges that Wells Fargo & Company maintained control over Wells Fargo Bank through pattern of racketeering activity, which is unlawful under Section 1962(b). Under each section Wells Fargo & Company is a RICO enterprise.[7]

---

[7] Where a corporation engages in racketeering activities and is the direct or indirect beneficiary of the pattern of racketeering activity, it can be both the "person" and the "enterprise" under section 1962(a) and (b). *Schreiber Distributing Co. v. Serv-well Furniture Company, Inc.*, 806 F.2d 1393 (9th Cir. 1986)

### 4.2  The Wells Fargo Bank RICO Enterprise.

147. Herein it is alleged that Defendant Wells Fargo Bank has received proceeds from racketeering and used the proceeds to operate an enterprise engaged in, or the activities of which affect, interstate or foreign commerce. Pursuant to 18 U.S.C. § 1962(a) Wells Fargo Bank is a RICO enterprise. *See* footnote 7.

### 4.3  The Wells Fargo Associated-In-Fact RICO Enterprise.

148. 18 U.S.C. § 1961(4) defines enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Hence, the Defendants are an associated-in-fact RICO enterprise ("the Wells Fargo Enterprise"). *See* ¶¶ 13 – 33.

### 4.4  The Use of the Racketeering Proceeds At Wells Fargo & Company.

149. Page 42 of Wells Fargo & Company's 2020 Annual Report contains a section titled "Noninterest Expense", which includes: personnel; technology, telecommunications, and equipment; occupancy; operating losses; professional and outside services; leases (expenses for assets leased to customers); advertising and promotion; restructuring charges; and other.

150. As Wells Fargo & Company and Wells Fargo Bank are consolidated for financial reporting purposes, it necessarily follows that these expenses are for both entities.

151. Plaintiff alleges that Wells Fargo & Company received racketeering proceeds from Wells Fargo Bank through "Funds Transfer Pricing", "Revenue and Expense Sharing" and "Enterprise Functions":

> Corporate treasury manages a funds transfer pricing methodology that considers interest rate risk, liquidity risk, and other product characteristics. Operating segments pay a funding charge for their assets and receive a funding credit for their deposits, both of which are included in net interest income. The net impact of the funding charges or credits is recognized in corporate treasury.

> -   Funds Transfer Pricing, Wells Fargo & Company 2020 Annual Report at 44.

> When lines of business jointly serve customers, the line of business that is responsible for providing the product or service recognizes revenue or expense with a referral fee paid or an allocation of cost to the other line of business based on established internal revenue-

48

sharing agreements. When a line of business uses a service provided by another line of business or enterprise function (included in Corporate), expense is generally allocated based on the cost and use of the service provided.

- Revenue and Expense Sharing, Wells Fargo & Company 2020 Annual Report at 44.

152. As to "Enterprise Functions", nowhere in the annual report can a description be found. All one can discern is that: it is part of "noninterest expense" and "corporate". Wells Fargo & Company 2020 Annual Report at 44, 52 and 55.

153. Plaintiff alleges that "Enterprise Functions" include such items as: Board of Directors; senior management; Law Department; Audit Department; upper district management; and information technology, both software and hardware.

154. Plaintiff alleges that Wells Fargo & Company used the proceeds to pay for the personnel, technology, telecommunications, equipment, and occupancy related to the operating segments "Consumer Banking and Lending" and "Corporate", including "Corporate Treasury" and "Enterprise Functions". To wit, the compensation of Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe, Philip J. Quigley, Enrique Hernandez, Jr., and Lloyd H. Dean.

155. Plaintiff further alleges that Wells Fargo & Company benefitted from the infusions of racketeering proceeds. *See* ¶ 36.

156. The OCC's most senior bank examiner for Wells Fargo was removed in April 2017.



## TOP FEDERAL WELLS FARGO INSPECTOR REMOVED

by Matt Egan   @MattEganCNN   |   April 7, 2017: 4:58 PM ET

***The top government inspector charged with watching over Wells Fargo has been removed from his duties monitoring the bank.***

49

The shakeup at the Office of the Comptroller of the Currency, a federal bank regulator, comes nearly seven months after a fake account scandal rocked Wells Fargo.

The OCC removed Bradley Linskens from his role as the most senior bank examiner for Wells Fargo within the past two weeks, a person familiar with the matter told CNNMoney. As the top inspector covering Wells Fargo since March 2014, Linskens worked inside of the bank's San Francisco headquarters and oversaw a team of 60 to 70 OCC employees, according to the source.

That means Linskens would have been overseeing Wells Fargo during the 2011 to 2016 timeframe the bank has admitted to creating as many as 2 million fake accounts, which led to the firing of 5,300 employees.

The activity prompted Wells Fargo to reach a $185 million settlement in September with the OCC, the Consumer Financial Protection Bureau and the L.A. City Attorney. The OCC fine totaled $35 million.

After 23 years at the regulator, Linskens was promoted to the role of senior national bank examiner in January 2016.



Fmr. Wells Fargo managers: the pressure was unbearable

https://money.cnn.com/2017/11/06/investing/wells-fargo-retaliation-whistleblower/index.html

50

COMPLAINT
Case No.

At the time, Comptroller of the Currency Thomas Curry praised Linskens for having "greatly contributed to fulfilling our mission of ensuring the safety, soundness and fairness of our federal banking system."

Curry, facing questions over how the Wells Fargo scandal was able to go on for so many years, opened an internal review into the agency in September 2016. He said at the time the review would "identify gaps in our supervision and assess any lessons the agency can learn from it."

The OCC declined to make Linskens available for comment, and attempts to reach him were unsuccessful.

Wells Fargo (WFC) declined to comment.

The news, which was first reported by Reuters, comes as Wells Fargo braces for the release of a wide-reaching investigation run by the bank's independent directors. Wells Fargo Chairman Stephen Sanger has promised the probe, launched amid the firestorm created by the settlement, will "follow the facts wherever they lead."

CNNMoney (New York)First published April 7, 2017: 4:58 PM ET

Top federal Wells Fargo inspector removed (cnn.com)

https://money.cnn.com/2017/04/07/investing/wells-fargo-fed-occ-examiner-removed/index.html?iid=EL


157. Wells Fargo & Company used the racketeering proceeds to pay the employees: to break banking laws, specifically the opening of bank accounts had to comply with 31 CFR § 1020.220 (a)(1); and to violate corporate policy, "Wells Fargo's Required Documents to Open an Account by Business Ownership Type".

158. It used the racketeering proceeds to create and maintain employment contracts for a number of individuals, including Richard M. Kovacevich, John G. Stumpf, Timothy J. Sloan, Charles W. Scharf, Mary T. Mack, Elizabeth A. Duke, Stephen W. Sanger, Carrie L. Tolstedt, James M. Strother, Kevin McCabe and David M. Julian. The contracts were fundamentally fraudulent because of the individuals' participation in violations of law and rewarding illegal activities. Thus, the officers and directors violated RICO with the corporations' knowledge and

the conduct of the officers and directors was for the purpose of benefitting the corporation. [8] Furthermore, the employment contracts provided the individuals with an independent personal stake in achieving the corporation's illegal objectives.

159. Plaintiff alleges that the involvement of high-level officials in the underlying schemes were pervasive. *See* ¶¶ 193 - 238, 299, 313.

160. Plaintiff further alleges that the officers' and directors' activities were unauthorized. https://www08.wellsfargomedia.com/assets/pdf/about/corporate/code-of-ethics.pdf

161. Plaintiff also claims that Wells Fargo & Company's acts, the corporation's acts, were unauthorized pursuant to banking laws, corporate policies (*e.g.*, audit rules), by-laws, obligations to the Securities and Exchange Commission and obligations to the New York Stock Exchange.

162. Wells Fargo & Company used the racketeering proceeds to pay a number or law firms to get away with the fraudulent schemes, including avoiding closing Wells Fargo Bank, *e.g.*: Proskauer Rose LLP, Munger Tolles & Olson, LLP, Ballard Spahr LLP, Sullivan & Cromwell LLP and Gibson, Dunn & Crutcher LLP.

163. Wells Fargo & Company used the racketeering proceeds to pay the accounting firm KPMG LLP to sustain the specified unlawful activity. The firm has served as Wells Fargo & Company's auditor since 1931.



San Francisco, California
February 23, 2021

120                                         Wells Fargo & Company

Wells Fargo & Company. 2020 Annual Report Page 120

---

[8] The Ninth Circuit has adopted the reasoning of *Petro-Tech, Inc. v. Western Co. of N. Am.,* 824 F.2d 1349, 1361 (3d Cir. 1987), holding that liability may arise under § 1962(a) under respondeat superior principles "when the individual or entity is benefited by its employee or agent's RICO violations." *Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1155 (9th Cir. 1992)

52

1

2 KPMG LLP

3 We have served as the Company's auditor since 1931.

4 San Francisco, California
February 23, 2021

5

6 Wells Fargo & Company                    239

7 Wells Fargo & Company. 2020 Annual Report Page 239

8    164. Wells Fargo & Company used the racketeering proceeds to pay several outside firms
9 to come up with ways and draft documents to enable its officers and directors to personally benefit
10 in achieving the Wells Fargo & Company's illegal objectives. To have its officers and directors
11 personally benefit from stock-based compensation (awards of stock, stock options), Wells Fargo
12 & Company paid several outside firms to evade the New York Stock Exchange,
13 https://www.nyse.com/quote/XNYS:WFC,          about          the          exchange's          rules.
14 https://www.nyse.com/regulation/nyse. Plaintiff cannot specifically name these firms but believe
15 this factual contention will have evidentiary support after a reasonable opportunity for further
investigation or discovery.

16    165. Wells Fargo & Company used the racketeering proceeds to create and maintain
17 websites to support the unlawful schemes. The websites were used to deceive everybody about
18 the practices in use to operate Wells Fargo Bank. For example, the website was used as follows:

19

20    Moving forward to make things right.
Fixing what went wrong.
21 October 2016

22 ------------------------------------------------------------------------

23    Established 1852. Re-established 2018 with a recommitment to you.
24 2018

25 ------------------------------------------------------------------------

26                           53

Making things right
Customers

From the start, we committed to make things right for customers who may have been harmed through unacceptable retail banking sales practices, regardless of when they occurred. We took a broad, comprehensive approach to identify any potential customer impact, including engaging a third-party consultant to review more than 165 million retail banking accounts opened between 2009 and 2016. We also reached out to approximately 40 million retail customers, and 3 million small business customers, asking them to contact us with any concerns about their accounts.

A guiding principle of our work has been to err on the side of our customers. For example, we refunded fees even when third-party data analysis could not definitively tell us whether an account was authorized by a customer or not.

In addition to working with customers directly to resolve issues related to unacceptable retail banking sales practices, we offered free mediation services and entered into a $142 million class-action settlement approved in 2018 to cover claims of our customers of unauthorized accounts dating back to 2002.

As noted earlier, we also are looking across the organization for any other areas or instances where customers may have experienced financial harm. If we identify any potential harm, we are committed to remediating customers and making things right.

- Learning from the past, transforming for the future
  Business Standards Report, Wells Fargo & Company
  Dec. 31, 2018

https://www08.wellsfargomedia.com/assets/pdf/about/corporate/business-standards-report.pdf

--------------------------------------------------------------------------------

Committed to making things right for any customer who was financially harmed by unacceptable sales practices, regardless of the time frame.

- Progress as of Feb.21, 2019

https://www08.wellsfargomedia.com/assets/pdf/commitment/progress-report.pdf

--------------------------------------------------------------------------------

54

166. Wells Fargo & Company used the racketeering proceeds to create and publish annual reports. These annual reports were not truthful and concealed the unlawful ways that were utilized. During the period 2002 – 2015, Wells Fargo issued 14 annual reports. Nowhere in any of these 14 annual reports can a word be found about the opening of unauthorized bank accounts and/or unacceptable sales practices in the retail bank. During this period, the market capitalization of Wells Fargo **increased by about 19% per year** from $ 73.7 billion in 2001 to $ 298 billion in 2017.[9]

| Year | Market cap | Change |
| --- | --- | --- |
| 2017 | $298.75 B | 7.94% |
| 2016 | $276.77 B | -0.01% |
| 2015 | $276.80 B | -2.34% |
| 2014 | $283.43 B | 18.75% |
| 2013 | $238.67 B | 32.60% |
| 2012 | $180.00 B | 23.85% |
| 2011 | $145.33 B | -10.88% |
| 2010 | $163.07 B | 16.68% |
| 2009 | $139.77 B | 42.58% |
| 2008 | $98.02 B | -1.52% |
| 2007 | $99.53 B | -17.11% |
| 2006 | $120.09 B | 13.94% |
| 2005 | $105.40 B | 0.08% |
| 2004 | $105.31 B | 4.80% |
| 2003 | $100.49 B | 27.18% |
| 2002 | $79.01 B | 7.21% |
| 2001 | $73.70 B | |

[9] There is a lag factor in the issuance of annual reports, *i.e.*, the annual report for the preceding year is issued in March of the following year.

COMPLAINT
Case No.

167. For the first time, in the 2016 Annual Report, issued in February of 2017, Wells Fargo disclosed the issues with the opening of unauthorized bank accounts and unacceptable sales practices in the retail bank:

> The independent Directors are conducting our own investigation to ensure we understand the root causes of the sales practices problem and have learned the lessons that will prevent any future recurrence. We expect to make findings of the investigation public before our 2017 Annual Meeting of Shareholders.
>
> We have enforced senior management accountability for the damage to Wells Fargo's reputation through very significant compensation actions. The Board accepted John Stumpf's recommendation to forfeit all of his unvested equity of approximately $41 million prior to his retirement as Chairman and CEO. The Board required Carrie Tolstedt, the departed head of Community Banking, to forfeit all of her approximately $19 million of unvested equity.
>
> In addition, given the overall impact on Wells Fargo's stakeholders in 2016, the eight current members of our 11-person Operating Committee who were in place before it was reconstituted in November 2016, including our new CEO Tim Sloan, received no cash bonuses for 2016 and forfeited up to 50% of the amounts they would have otherwise received under their 2014 performance share awards that vested following 2016. Combined, these amounts represent lost compensation of approximately $32 million, based on 2016 target bonuses and our share price on February 28, 2017, when the Board took these actions.
>
> While the Board and management have made significant changes in the wake of the sales practices issue, I want to assure our shareholders that important aspects of Wells Fargo will not change. We serve the financial needs of one in three U.S. households, and we remain committed to generating long-term shareholder value by delivering superior returns across a variety of market conditions due to our diverse business model. However, there is no question that the impact of improper sales practices has damaged our company's reputation and the bond of trust with our customers. The Board, management and Wells Fargo's 269,000 team members are determined to restore that reputation and re-establish that bond of trust. I am confident that we will use this moment of testing to make Wells Fargo stronger in the years ahead.
>
> Sincerely,
> Stephen W. Sanger
> *Chairman of the Board*
>
> Wells Fargo & Company Annual Report 2016 – Page 3

56

Our challenges in 2016 were among the toughest in our company's history. Unacceptable sales practices in our retail bank resulted in accounts being opened for customers that they were unaware of and neither needed nor wanted. This exposed behaviors that needed to be addressed. These behaviors were contrary to our values, raised questions about our culture, and damaged our reputation and the trust of many of our stakeholders.

I want to assure you that we are facing these problems head on, and I am confident that Wells Fargo will emerge a stronger company.

Our top priority is rebuilding trust through a comprehensive plan that includes making things right for our customers and team members, ensuring we fix problems at their root cause, and building a better bank for the future. We are committed to transparency as we connect with all stakeholders more frequently through increased communications.

We are conducting thorough reviews and investigations to fully understand where things broke down and where we failed. We are committed to learning from our mistakes because we recognize the inappropriate sales practices in our retail bank did not serve the interests of our customers, our team members, or our company. And despite efforts to set things right, we did not move quickly enough to address these issues.

All of this was unacceptable, and the lessons we learned must never be forgotten as we make changes necessary to regain our status as one of the world's best financial institutions.

**REBUILDING TRUST**
MAKING IT RIGHT FOR CUSTOMERS
AND TEAM MEMBERS

We are fully committed to making things right for our stakeholders and rebuilding trust. This is a long-term effort — one requiring commitment, patience, and resolve.

At the outset, we employed a third-party consultant to review accounts and identify impacted customers. We reviewed more than 94 million checking, credit card, and line of credit accounts, dating from 2011 to 2016. Based on that review, we refunded more than $3.2 million in charges and fees on approximately 130,000 accounts that we could not rule out as being initiated without a customer's authorization. We also reached out to approximately 40 million retail customers and 3 million small businesses through email, statement messaging, and postcards to ensure those affected by the unacceptable sales practices could reach us. We are researching how customers' credit scores were impacted as a result of potentially unauthorized credit cards, with the goal of aiding customers whose credit scores might have been affected. And we decided to go beyond the requirements of our sales practices consent orders to expand our account reviews to include the years 2009 and 2010.

57

Timothy J. Sloan
*Chief Executive Officer and President*
Wells Fargo & Company
February 1, 2017

Wells Fargo & Company Annual Report 2016 – Page 5

168. After these disclosures, the market capitalization of Wells Fargo **decreased by about 19% per year** from $ 298 billion in 2017 to $ 125 billion in 2020.

| Year | Market cap | Change |
|------|-----------|--------|
| 2020 | $124.77 B | -43.90% |
| 2019 | $222.43 B | 5.37% |
| 2018 | $211.10 B | -29.34% |
| 2017 | $298.75 B | |

169. Plaintiff's allegation that Wells Fargo's annual reports during the period 2002 through 2015 were fraudulent is supported by Administrative Proceeding File No. 3-19704 at the Securities and Exchange Commission, "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21c of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order".

170. The action resulted in the following press release on February 21, 2020:

**WELLS FARGO TO PAY $500 MILLION FOR MISLEADING INVESTORS ABOUT THE SUCCESS OF ITS LARGEST BUSINESS UNIT**

***Payment Will Be Distributed to Harmed Investors***

*Washington D.C., Feb. 21, 2020 —*

The Securities and Exchange Commission today charged California-based Wells Fargo & Co. for misleading investors about the success of its core business strategy at a time when it was opening fake accounts for unknowing customers and selling unnecessary products that went unused. Wells Fargo has agreed to pay $500 million to settle the charges, which

COMPLAINT
Case No.

will be returned to investors. The $500 million payment is part of a combined $3 billion settlement with the SEC and the Department of Justice.

According to the SEC's order, between 2012 and 2016, Wells Fargo publicly touted to investors the success of its Community Bank's "cross-sell" strategy – selling additional financial products to its existing customers – which it characterized as a key component of its financial success. The order finds that Wells Fargo sought to induce investors' continued reliance on the cross-sell metric even though it was inflated by accounts and services that were unused, unneeded, or unauthorized. According to the order, from 2002 to 2016, Wells Fargo opened millions of accounts of financial products that were unauthorized or fraudulent. Wells Fargo's Community Bank also pressured customers to buy products they did not need and would not use. The order finds that these accounts were opened through sales practices inconsistent with Wells Fargo's investor disclosures regarding its purported needs-based selling model.

"Wells Fargo repeatedly misled investors, including through a misleading performance metric, about what it claimed to be the cornerstone of its Community Bank business model and its ability to grow revenue and earnings," said Stephanie Avakian, Co-Director of the SEC's Division of Enforcement. "This settlement holds Wells Fargo responsible for its fraud and furthers the SEC's goal of returning funds to harmed investors."

The SEC's order finds that Wells Fargo violated the antifraud provisions of the Securities Exchange Act of 1934. Wells Fargo has agreed to cease and desist from committing or causing any future violations of these provisions and to pay a civil penalty of $500 million. The SEC will distribute this money to harmed investors.

The SEC's investigation was conducted by Victor Hong, John Roscigno, Jason H. Lee, and Erin E. Wilk, with assistance from Suzy LaMarca and John Han, under the supervision of Monique C. Winkler of the San Francisco Regional Office. Polly Hayes, Dustin Ruta, and Karen Klotz of the Philadelphia Regional Office also assisted the investigation. The SEC's investigation is continuing.

The SEC appreciates the assistance of the U.S. Attorney's Offices for the Central District of California and the Western District of North Carolina, the Civil Division of the Department of Justice, the Federal Bureau of Investigation, the Federal Deposit Insurance Corporation - Office of Inspector General, the Federal Housing Finance Agency - Office of Inspector General, the Office of Inspector General for the Board of Governors of the Federal Reserve System, and the U.S. Postal Inspection Service.

SEC.gov | Wells Fargo to Pay $500 Million for Misleading Investors About the Success of Its Largest Business Unit

https://www.sec.gov/news/press-release/2020-38

171. Furthermore, on November 13, 2020, the Securities and Exchange Commission initiated Case 3:20-cv-07987 at the United States District Court Northern District of California, San Francisco Division.

172. The action resulted in the following press release on November 13, 2020:

**SEC CHARGES FORMER WELLS FARGO EXECUTIVES FOR MISLEADING INVESTORS ABOUT KEY PERFORMANCE METRIC**

*Washington D.C., Nov. 13, 2020 —*
The Securities and Exchange Commission today charged former Wells Fargo & Co. CEO and Chairman John G. Stumpf and former head of Wells Fargo's Community Bank Carrie L. Tolstedt for their roles in allegedly misleading investors about the success of the Community Bank, Wells Fargo's core business. The SEC's filings include settled charges against Stumpf, who agreed to pay a $2.5 million penalty, and a litigated action alleging Tolstedt committed fraud. The SEC previously filed settled charges against Wells Fargo for engaging in the misconduct.

According to the SEC's complaint against Tolstedt, from mid-2014 through mid-2016, Tolstedt publicly described and endorsed Wells Fargo's "cross-sell metric" as a means of measuring Wells Fargo's financial success despite the fact that this metric was inflated by accounts and services that were unused, unneeded, or unauthorized. The complaint further alleges that Tolstedt signed misleading sub-certifications as to the accuracy of Wells Fargo's public disclosures when she knew or was reckless in not knowing that statements in those disclosures regarding Wells Fargo's cross-sell metric were materially false and misleading.

The SEC's order against Stumpf finds that in 2015 and 2016 he signed and certified statements filed with the Commission, which he should have known were misleading, regarding both Wells Fargo's Community Bank cross-sell strategy and its reported metric. According to the order, Stumpf failed to assure the accuracy of his certifications after being put on notice that Wells Fargo was misleading the public about the cross-sell metric.

"If executives speak about a key performance metric to promote their business, they must do so fully and accurately," said Stephanie Avakian, Director of the SEC's Division of Enforcement. "The Commission will continue to hold responsible not only the senior executives who make false and misleading statements but also those who certify to the accuracy of misleading statements despite warnings to the contrary."

The SEC's complaint, filed in the U.S. District Court for the Northern District of California, charges Tolstedt with violating the antifraud provisions of the federal securities laws and seeks a permanent injunction, civil penalties, disgorgement with prejudgment interest, and an officer-and-director bar. In the SEC's administrative proceeding, Stumpf,

without admitting or denying the SEC's findings, has agreed to cease and desist from committing or causing any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 and to pay a civil penalty of $2.5 million. The SEC will combine this money with $500 million paid by Wells Fargo in a previous settlement and distribute the sum to harmed investors.

The SEC's investigation was conducted by Rebecca Lubens, Victor Hong, John Roscigno, and Erin E. Wilk with assistance from Suzy LaMarca under the supervision of Jason H. Lee and Monique C. Winkler of the San Francisco Regional Office. The SEC's litigation against Tolstedt will be conducted by Ms. LaMarca, Ms. Lubens, and Marc Katz.

SEC.gov | SEC Charges Former Wells Fargo Executives for Misleading Investors About Key Performance Metric

https://www.sec.gov/news/press-release/2020-281

173. Wells Fargo & Company used the racketeering proceeds to create and publish 10Ks and 10Qs. The documents were misleading. *See* ¶¶ 166 - 172.

## 4.5   The Use of the Racketeering Proceeds At Wells Fargo Bank.

174. Plaintiff alleges that prior to 2002 Wells Fargo Bank was a legitimate business but then it started to use racketeering proceeds, *e.g.*, money laundering and similar activities.

175. Plaintiff's six bank accounts were opened and maintained at Wells Fargo's retail branch network, the Community Bank. Plaintiff alleges that Wells Fargo Bank used the proceeds to pay for the personnel, technology, telecommunications, equipment, and occupancy related to opening and maintaining the six accounts. In other words, the proceeds went to pay for: electricity, water, telephone, information technology hardware and software, internet connections, property taxes, insurance etc. of a Wells Fargo bank branch; wages to the employees who opened and maintained the accounts; wages for the branch manager; wages for the district managers overseeing the branch; selling commissions to branch bankers, branch manager and district managers; Board of Directors expenses allocated to the branch; Law Department expenses allocated to the branch, Audit Department expenses allocated to the branch, as well as a number of allocations of expenses that Plaintiff believe will have evidentiary support after a reasonable opportunity for further investigation or discovery.

176. Wells Fargo Bank knew what was going on and not only ignored it but retaliated against employees who tried to correct the wrongdoings.



## I CALLED THE WELLS FARGO ETHICS LINE AND WAS FIRED

by Matt Egan   @MattEganCNN   |   September 21, 2016: 1:26 PM ET

***Millions of phony accounts. Fake bank card PIN numbers.***
***Fictitious email accounts.***

Wells Fargo admitted to firing 5,300 employees for engaging in these shocking tactics. The bank earlier this month paid $185 million in penalties and has since apologized.

Now CNNMoney is hearing from former Wells Fargo (WFC) workers around the country who tried to put a stop to these illegal tactics. Almost half a dozen workers who spoke with us say they paid dearly for trying to do the right thing: they were fired.

"They ruined my life," Bill Bado, a former Wells Fargo banker in Pennsylvania, told CNNMoney.

Bado not only refused orders to open phony bank and credit accounts. The New Jersey man called an ethics hotline and sent an email to human resources in September 2013, flagging unethical sales activities he was being instructed to do.

Eight days after that email, a copy of which CNNMoney obtained, Bado was terminated. The stated reason? Tardiness.

### HR official describes 'retaliation'

Retaliating against whistleblowers is a major breach of trust. Ethics hotlines are exactly the kind of safeguards put in place to prevent illegal activity from taking place and provide refuge to employees from dangerous work environments.

Wells Fargo CEO John Stumpf made precisely that point on Tuesday when he testified before angry Senators.

"Each team member, no matter where you are in the organization, is encouraged to raise their hands," Stumpf told lawmakers. He mentioned the anonymous ethics line, adding, "We want to hear from them."

But that's not the experience of some former Wells Fargo workers.



"I told them that's not only unethical but illegal"

Bill Bado, fired Wells Fargo employee, seen here with his daughters

One former Wells Fargo human resources official even said the bank had a method in place to retaliate against tipsters. He said that Wells Fargo would find ways to fire employees "in retaliation for shining light" on sales issues. It could be as simple as monitoring the employee to find a fault, like showing up a few minutes late on several occasions.

"If this person was supposed to be at the branch at 8:30 a.m. and they showed up at 8:32 a.m, they would fire them," the former human resources official told CNNMoney, on the condition he remain anonymous out of fear for his career.

CNNMoney spoke to a total of four ex-Wells Fargo workers, including Bado, who believe they were fired because they tipped off the bank about unethical sales practices.

COMPLAINT
Case No.

Another six former Wells Fargo employees told CNNMoney they witnessed similar behavior at Wells Fargo -- even though the company has a policy in place that is supposed to prevent retaliation against whistleblowers.

CNNMoney has taken steps to confirm that the workers who spoke anonymously did work at Wells Fargo and in some cases interviewed colleagues who corroborated their reports.

It's possible Wells Fargo could face legal consequences for any retaliation that occurred against employees who called the ethics line.

"It is clearly against the law for any company (or executives of such companies) to try to suppress whistleblowing," Harvey Pitt, former chairman of the SEC, told CNNMoney in an email.

A number of statutes -- including Sarbanes-Oxley and Dodd-Frank -- "make this unambiguously clear," Pitt said.

"I endured harsh bullying ... defamation of character, and eventually being pinned for something I didn't do," said Heather Brock, who was fired earlier this month as a senior business banker at a Wells Fargo branch in Round Rock, Texas.

### 'That's retaliation'

One such former employee was fired after flagging issues directly to Stumpf, according to Senator Bob Menendez.

At the Senate hearing, Menendez read the New Jersey woman's 2011 email to Stumpf, where she described improper sales tactics she felt were "wrong."

"Did you read that email?" Menendez asked Stumpf.

"I don't remember that one," Stumpf replied.

"Okay, well she was fired. ... So much for the safe haven," Menendez said.

Several senators spoke about the plight of the mostly 5,300, low-level employees who were fired related to the scandal.

The firing certainly took a huge toll on Bado's life. It put a permanent stain on his securities license, scaring off other prospective bank employers. Today, the New Jersey man's house is on the verge of being foreclosed on and he's working part-time, at Shop-Rite.

"You wonder where the justice is," Bado said.

Ken Springer, a former FBI agent who runs a firm that offers a whistleblower hotline service, was alarmed by the allegations made by former Wells Fargo employees.

"That's retaliation. It's a big problem -- and a perfect example of what shouldn't happen," Springer said. "It looks like there's been a terrible breakdown of checks and balances at Wells Fargo."

In response to CNNMoney's report, a Wells Fargo spokeswoman said: "We do not tolerate retaliation against team members who report their concerns in good faith." She emphasized that employees are encouraged to immediately report unethical behavior to their manager, HR representative or 24-hour ethics line.



*'Excessive tardiness' eight days after HR email*

Wells Fargo confirmed to CNNMoney that Bado had worked there. However, the bank declined to comment on why Bado left and and on the ethics complaint with corresponding report number he cited in emails. "Everything submitted to the EthicsLine is investigated," a Wells Fargo spokeswoman said.

While ethics complaints are supposed to be confidential, documents show that Bado did speak out before he was fired. On September 19, 2013, Bado wrote an email to a Wells Fargo HR rep and copied his regional manager, where he detailed improper sales tactics.

Documents show Bado was fired -- for "excessive tardiness" -- just eight days later.

"I have been asked on several occasions to do things that I know are not ethical and would be grounds for discharge," Bado said in the email to HR.

He said a branch manager on "many occasions" asked him to send out a debit card, "pin it," and enroll customers in online banking -- "all without the customers (sic) request or knowledge." Those are precisely the same practices that regulators fined Wells Fargo for three years later and that senators grilled the bank over this week.

*Lose, lose situation for Heather Brock*

Brock, the business banker from Texas, told CNNMoney she experienced a similar situation. The 26-year-old single parent of two young boys was fired soon after she contacted the company's ethics line about illegal sales practices she witnessed.

Wells Fargo also confirmed Brock used to work at the company but declined to comment further.

Brock was fired earlier this month, with Wells Fargo accusing her of falsifying documents -- a charge Brock emphatically denies. Brock said the company bullied her into admitting she did something wrong.

A current Wells Fargo employee who works in Brock's branch vouched for her version of events.

"That's really scary when you're with a big corporation like this and HR doesn't have your back," said the current employee, who wished to remain anonymous so as not to get fired as well.

Brock is hoping her story forces meaningful change at Wells Fargo.

"You lose if you do complain and you lose if you don't. What does a powerless employee do?" Brock said.

CNNMoney (New York) First published September 21, 2016: 8:40 AM ET

Wells Fargo workers: I called the ethics line and was fired (cnn.com)

https://money.cnn.com/2016/09/21/investing/wells-fargo-fired-workers-retaliation-fake-accounts/index.html?iid=EL

COMPLAINT
Case No.

177. The bank's culture was a high-pressure environment; the law, rules and policies be damned.



**WORKERS TELL WELLS FARGO HORROR STORIES**

by Matt Egan  @MattEganCNN  |  September 9, 2016: 4:24 PM ET

*Relentless pressure. Wildly unrealistic sales targets. Employees leaning on family members and friends to open unnecessary bank accounts.*

That's how more than a dozen former Wells Fargo employees described the bank's culture to CNNMoney.

Wells Fargo (WFC)has been accused by federal regulators of illegal activity on a stunning level. Authorities say employees at the bank secretly created millions of unauthorized bank and credit card accounts between 2011 and July 2015, allowing the bank to make more money in fees and meet internal sales targets.

Wells Fargo agreed to pay penalties of $185 million and fired 5,300 employees over the last few years related to this illegal activity. The news is rocking the industry and rippling across Wells Fargo's millions of customers nationwide.

Former employees tell CNNMoney that they felt incredible demands from managers to meet sales quotas. The same managers turned a blind eye when ethical and even legal lines were crossed.

"I had managers in my face yelling at me," Sabrina Bertrand, who worked as a licensed personal banker for Wells Fargo in Houston in 2013, told CNNMoney. "They wanted you to open up dual checking accounts for people that couldn't even manage their original checking account."

Currently a middle school teacher, Bertrand said she believes the sales targets were set by managers who were higher up: "The sales pressure from management was unbearable."

The pressure cooker environment is also described in a lawsuit filed by Los Angeles against Wells Fargo in May 2015. The lawsuit says that Wells Fargo's district managers discussed daily sales for each branch and employee "four times a day, at 11 am, 1 pm, 3 pm and 5 pm."

It all stems from Wells Fargo's internal goal of selling at least eight financial products per customer. It's what Wells Fargo calls the "Gr-eight initiative." Currently, Wells Fargo boasts an average of about six financial products per customer.

In pursuit of this goal, Wells Fargo employees engaged in all kinds of sordid practices. One of them was internally called "pinning," where the bank issued ATM cards and assigned PIN numbers without customer authorization.

The bankers would impersonate their customers and "input false generic email addresses such as 1234@wellsfargo.com, noname@wellsfargo.com, or none@wellsfargo.com to ensure the transaction is completed," the lawsuit said. The customer, meanwhile, remained completely unaware of the unauthorized activity.

Anthony Try, who worked at Wells Fargo's branches in San Francisco and San Diego as a personal banker and sales representative, told CNNMoney that he believes "management was fully aware of this," but his bosses deliberately "turned a blind eye."

Try, who quit in 2013 because he no longer believed in what he was doing, thinks the illegal activity was systemic.

"It was ingrained in the culture for a long time," he said.

Try, currently a musician and manager, said he did not open unauthorized accounts. However, he did open accounts for friends and family -- with their permission -- in order to meet the incredible demands from managers.

"There would be days where we would open five checking accounts for friends and family just to go home early," he said.

The California lawsuit supports these claims. Wells Fargo paid $50 million to the City and County of Los Angeles to settle the suit as part of the broader $185 million in fines announced on Thursday.

Employees who failed to meet their daily goals were "reprimanded and told to do whatever it takes to meet individual sales quotas," the California lawsuit alleges.

COMPLAINT
Case No.

Management even encouraged employees to "achieve 'solutions' through family members," the suit says.

Some Wells Fargo employees say they have "tapped out every family member and friend for accounts," while others say they "spend holiday dinners trying to convince" them to sign up, the lawsuit said.

Employees and the California lawsuit both allege that higher-ups at Wells Fargo also share in the blame for the fraud.

Wells Fargo has "known about and encouraged these practices for years," the California



lawsuit said. "Wells Fargo has engineered a virtual fee-generating machine, through which its customers are harmed, its employees take the blame, and Wells Fargo reaps the profits."

"The culprit in this case in not just the individuals involved, but the corporate culture itself," said Julie Ragatz, director of the Center for Ethics in Financial Services at the American College of Financial Services.

In response to CNNMoney's reporting, a Wells Fargo spokeswoman said the "majority of our team members do work hard to do what's in customers' best interest."

COMPLAINT
Case No.

Wells Fargo also said it made a number of "fundamental changes to help ensure our team members are not being pressured to sell products."

Those changes include enhanced training that values ethics and how to report concerns, increased risk management professionals at branches and additional mystery shoppers.

One former Wells Fargo employee, who requested his name not be used so he doesn't hurt his career in banking, said he experienced this firsthand. He said managers told him to open unauthorized accounts and, when customers called, to apologize and say it was a mistake. "This was not done by employees trying to hit their sales numbers, it was more of threats from upper management," he said, adding that workers feared they would lose their job.

According to the California lawsuit, Wells Fargo employees for years engaged in practices known as "gaming." One of them was "sandbagging," which occurred when bankers refused to open accounts requested by customers until the next reporting period to boost their sales quotas, the lawsuit claimed.

A former longtime Wells Fargo consumer bank employee in the Minneapolis region, who also spoke on the condition of anonymity, described a "cutthroat" environment that caused employees to fear for their job and make "bad ethical choices."

"It was a real s**t show over there," he said.

CNNMoney (New York)First published September 9, 2016: 4:24 PM ET

Workers tell Wells Fargo horror stories (cnn.com)

https://money.cnn.com/2016/09/09/investing/wells-fargo-phony-accounts-culture/index.html?iid=EL

178. The unlawful activities at the bank were entrenched for a long time.



**WELLS FARGO WORKERS: FAKE ACCOUNTS BEGAN YEARS AGO**

COMPLAINT
Case No.

by Matt Egan   @MattEganCNN   |   September 26, 2016: 4:14 PM ET

### *Wells Fargo's fake accounts have been around a long time.*

Almost a dozen Wells Fargo (WFC) workers told CNNMoney that the shocking tactic -- where employees opened unauthorized accounts to meet unrealistic sales goals -- has been around much longer than the bank has acknowledged.

"These practices were going on way before 2011," said Susan Fischer, a former Wells Fargo branch manager, who worked at the bank for five years, starting in 2004.

Americans were stunned to learn earlier this month that Wells Fargo employees had opened as many as two million fake accounts since 2011, and that 5,300 people had been fired as part of the scam since then.

The Justice Department launched an investigation two weeks ago. Two Congressional hearings have been called. CEO John Stumpf was skewered in the Senate last week and the House hearing is scheduled for this Thursday.

Fischer said she remembers her district manager instructing her in 2007 to make the employees reporting to her open unauthorized accounts. It was about a year after she moved from Wisconsin to Arizona to manage a Wells Fargo branch.

"My district manager told me, 'Do whatever you need to do,'" Fischer said.

But Fischer ran into trouble when she refused take part in fraudulent activity. Superiors said she wasn't hitting her goals. Soon, Fischer got so stressed from her work environment that she had to take a medical leave of absence and wasn't allowed to return.

"It took a huge chunk of my life and my income," said Fischer.

Why is the former Wells Fargo branch boss speaking up now? "If someone doesn't stand up, this is going to continue," she said.

Fischer's account matches those of other employees, who spoke to CNNMoney, where the bank made employees' lives difficult when they couldn't meet sales targets, whether via legitimate or illegal tactics.

It's not clear exactly how far back the fake account trouble goes, nor how widespread it was prior to 2011.

However, a confidential Wells Fargo sales quality manual that was last updated in August 2007 suggests the bank's compliance team was aware of issues even then.

71

The document, used in a 2011 legal case against the bank, stressed that employees must obtain a customer's "express consent and agreement" -- those words were underlined and in bold -- for each and every line of credit opened.

The manual further reminds employees that customers must "request issuance of a Business ATM/Check Card" and that "check cards should not be mailed to store addresses or held at a store location." Wells Fargo also warned that splitting a customer deposit into multiple



These practices were going on way before 2011."

Susan Fischer
former Wells Fargo branch manager

accounts to boost incentive metrics is a "sales integrity violation."

Wells Fargo itself seems to have tacitly acknowledged that fake accounts may have been a big problem earlier than the 2011. Earlier this week, while under fire at the Senate hearing, the Wells Fargo CEO said the bank would expand its review to include 2009 and 2010.

Wells Fargo declined to comment on why only those two years will be included, nor about the allegations former employees made to CNNMoney.

When Denny Russo started working in April 2010 at a Wells Fargo in Petaluma, California, he found that accounts were already being opened without authorization. "The sales machine was well under way then," the former teller said.

Russo said Wells Fargo's senior executives are lying when they claim they were unaware of this problem.

COMPLAINT
Case No.

"The part that really upsets me the most is these directives absolutely came from upper management," he said.

Emilie Ward, another Wells Fargo teller in Chaska, Minnesota, told CNNMoney that "100% this began long before 2011." Ward joined Wells Fargo in 2008 and said customers often had no idea about accounts being opened.



My first day was around April 2010 and the sales machine was well under way then,"

-- former Wells Fargo teller Denny Russo (seated left).

"They would set up debit cards people didn't know about and have them mailed to the bank," she said.

Another former teller, Rebecca Lewis, said she saw unauthorized accounts -- especially credit cards -- opened when she was hired in March 2009 in Idaho. Her attempts to flag the issue by calling the ethics hotline backfired, echoing allegations other former workers who say they were retaliated against.

"Wells Fargo has been a hazard to the public for a long time," Lewis said.

CNNMoney (New York)First published September 26, 2016: 10:24 AM ET

Wells Fargo workers: Fake accounts began years ago (cnn.com)

https://money.cnn.com/2016/09/26/investing/wells-fargo-fake-accounts-before-2011/index.html?iid=EL

COMPLAINT
Case No.

**4.6  Wells Fargo & Company Maintained Control Over Wells Fargo Bank Through A Pattern of Racketeering Activity.**

179. The purpose of Wells Fargo & Company's racketeering activity was to maintain control over Wells Fargo Bank.

180. As to this control, it was maintained by deceiving Wells Fargo Bank's regulators: the OCC, the Federal Reserve, and the Federal Deposit Insurance Corporation ("FDIC"). By doing so, Wells Fargo & Company maintained control over Wells Fargo Bank in a manner that defrauded Plaintiff of regulatory protection, both before the unlawful schemes were discovered by the regulators in about September 2016, and after Wells Fargo agreed to remedy the unlawful schemes through consent orders.

181. Wells Fargo Bank's interactions with its regulators were deceptive enabled by Wells Fargo & Company's control of the bank's Board of Directors, Law Department, Audit Department and Branch Management (district managers). From this organizational set-up, Wells Fargo & Company controlled the bank through a "small number of people". Critically, this "small number of people" were the ones who interacted with the bank's regulators and issued reports to the bank's regulators.

182. If not for this conduct Plaintiff alleges that Wells Fargo & Company would have lost control of the bank, *i.e.*, one or more of the three regulators would have seized control over the bank. The most typical result would have been for the FDIC to assume Plaintiff's six accounts or allowed other banks to assume them. Either way, somebody else would have overseen Plaintiff's six accounts.

183. Therefore, the circuit breakers put in place by the legislature to protect the public from unsafe and unsound banking practices, namely the mandate bestowed on the OCC, the Federal Reserve, and the FDIC to maintain safe and sound banking practices, including the power to revoke banking licenses, seize depository accounts and deny/rescind funding from the FRBs, were disabled, *i.e.*, Wells Fargo & Company disabled the circuit breakers at Wells Fargo Bank. If not

COMPLAINT
Case No.

1  for Wells Fargo & Company's control of the bank's Board of Directors, Law Department, Audit
2  Department and Branch Management (district managers), one or more circuit breakers would have
3  been tripped indicating that the circuit breaker (one of the three designated federal overseers) had
4  detected unsafe and unsound banking practices that should not be ignored.

5    184. Wells Fargo Bank was one of the major participants in America's financial markets
6  during the period that led up to the Great Recession, the 2007-2009 financial crisis which from
7  peak to trough caused 8.8 million jobs lost and $19.2 trillion in household wealth lost (2011
8  dollars).https://www.treasury.gov/resource-center/data-chart-
9  center/Documents/20120413_FinancialCrisisResponse.pdf.

10    185. Wells Fargo & Company's control over Wells Fargo Bank was done to deceive the
11  bank's regulators, thus keeping Wells Fargo & Company in control over the bank.

12    186. Plaintiff alleges that except for this fraud on banking regulators at Wells Fargo Bank,
13  and it was not alone in engaging in this conduct, the worst financial disaster since the Great
14  Depression could have been prevented because the crisis was facilitated by certain key factors.

15    187. First, a credit bubble, mainly in residential subprime and other mortgages, encouraged
16  by the origination, securitization, and sale of enormous numbers of loans by mortgage bankers
17  into complex mortgage-backed securities (MBS). These MBS, including collateralized debt
18  obligations (CDOs), were marketed by investment banks, purchased by hedge funds and other
19  Wall Street investors, and blessed with AAA-ratings by rating agencies who were complacent (or
20  worse). Plaintiff alleges that Wells Fargo Bank was profoundly involved in these markets and the
21  manipulation of these markets. And because of its long history, organizational deep understanding
22  of all segments of the markets, broad and diverse customer base, and geographic footprints, knew
23  that the markets were unlawfully engineered. If the true and correct operational and financial data
24  of Wells Fargo Bank had been disclosed to its regulators, circuit breakers would have been tripped.

25
26

188. Second, the development and growth of complicated derivative instruments that amplified risks, including synthetic CDOs and credit default swaps (CDS). These derivative markets were neither transparent nor regulated and created a tangled web of counterparties that increased systemic risk when the credit bubble burst. Plaintiff alleges that Wells Fargo Bank was a major force in the development and growth of these derivative markets. And because of its long history, organizational deep understanding of all segments of the markets, broad and diverse customer base, and geographic footprints, knew that the derivative markets were ticking massive financial destruction time-bombs. If Wells Fargo Bank had been forthright with its regulators, circuit breakers would have been tripped.

189. Third, the destabilizing use of high leverage by financial institutions, which was made possible because of inadequate capital regulations. The use of high leverage also meant that many institutions were operating with inadequate liquidity, which increased their risk once credit markets contracted. Plaintiff alleges that Wells Fargo Bank as early as 2002 engaged in extensive accounting fraud that made the bank appear to be financially sound, sufficiently capitalized, and in compliance with applicable banking laws, when, in fact, none of that was the case. Plaintiff alleges that this fraud distorted the bank's supervisory ratings and capital ratios and hid its serious undercapitalization. If Wells Fargo Bank had been upfront with its regulators, circuit breakers would have been tripped.

190. Fourth, a variety of regulatory mistakes, including the end of the Glass-Steagall Act, the setting of historically low interest rates for too long, ineffective regulatory oversight of financial institutions, and the existence of a completely unregulated shadow financial system. Culture will follow the path of least resistance and in this environment Wells Fargo & Company's control over Wells Fargo Bank was like a "pig in a sty": (a) everything was dirty; (b) everybody was or became dirty; and (c) the dirt hid everything. Wells Fargo & Company put in place and maintained a culture at Wells Fargo Bank of doing what had to be done to make the money it had

COMPLAINT
Case No.

1   established for the bank to make; the regulators be damned. If Wells Fargo Bank had been
2   controlled to further safe and sound banking practices, including in all interactions with its
3   regulators and in all reporting to its regulators, circuit breakers would have been tripped.

4

5   **5. Since At Least 2002, the Defendants Have Used Their Money and Power to Infiltrate and Corrupt Legitimate Business, Labor Standards, Capital Markets and to Subvert and Corrupt Our Branches of Government.**

6

7   191. On February 21, 2020 the Department of Justice announced:

8   "Wells Fargo & Company and its subsidiary, Wells Fargo Bank, N.A., have agreed to pay $3 billion to resolve their potential criminal and civil liability stemming from a practice between 2002 and 2016 of pressuring employees to meet unrealistic sales goals that led thousands of employees to provide millions of accounts or products to customers under false pretenses or without consent, often by creating false records or misusing customers' identities, the Department of Justice announced today."

9

10

11

12   https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices

13

14   192. From at least 2002 until October 2016, Wells Fargo's retail branch network, the
15   Community Bank, which generated about 60% of the bank's annual profits, systematically
16   violated laws and regulations by issuing and managing products and services without
17   authorization.

18   193. The report dated April 10, 2017 titled The Independent Directors of the Board of
19   Wells Fargo & Company Sales Practices Investigation ("04/10/2017 Wells Fargo Board Report")
20   shows that:

21   • "Going back to at least 2002, however, committee materials referenced sales conduct or "gaming" issues." ( 04/10/2017 Wells Fargo Board Report at 98).

22   • Stumpf was also aware of specific sales practice issues over the years. He was
23   notified of the incident involving the branch in Colorado in 2002, described below
24   at pages 73-74. Stumpf received numerous customer and employee complaints
25   about sales practices and sales pressure, which he or his assistants referred to

26

appropriate subordinates without further follow-up. (04/10/2017 Wells Fargo Board Report at 55)

- Employment Section lawyers encountered sales misconduct and the termination of several employees at one time (discussed within the Law Department as "mass terminations"), dating back at least to 2002. In summer 2002, Internal Investigations determined that almost an entire branch in Colorado engaged in a form of "gaming" in connection with a promotional campaign in the second quarter of 2002. Although most within Wells Fargo recall this incident as involving improper teller referral credits, it also involved employees issuing debit cards without customer consent. Tellers involved in the gaming scheme reported that managers instructed them to input the referrals or supported the activity. Wells Fargo's normal application of its fidelity bond required termination. Several employees involved in the incident, including managers, were terminated or resigned. Rather than terminate everyone else involved, which would have eliminated most of the branch's tellers and personal bankers, Wells Fargo sought and obtained an exception to the fidelity bond from its underwriter. Employment Law Section attorneys advised in connection with the incident. Around the same time, Wells Fargo decided to reconvene a task force that had historically advised on interpretation of the fidelity bond. The goal of the reconvened task force was to "[d]evelop recommendations that will minimize sales integrity problems and clarify roles and processes when they do occur." The task force included work streams on sales integrity training and reformation of the fidelity bond. Members of the Employment Section of the Law Department at both line and leadership levels participated in this work. The task force decided to "better educate our team members about gaming … and then hold them strictly accountable." Its work led to the roll out of a new sales integrity training program and a reaffirmed understanding that manipulation and dishonesty were inconsistent with Wells Fargo's core values, and compromised Wells Fargo's integrity as an institution entrusted with its customers' assets. Additional "mass terminations" for gaming of Wells Fargo's incentive compensation system continued sporadically

78

over the next ten years (in addition to individual terminations). Employment lawyers at all levels were either made aware of or were themselves involved in addressing these terminations. During this period, Wells Fargo's employment lawyers generally focused on the litigation costs of sales integrity cases in the event of lawsuits by terminated employees. The costs of sales integrity cases, however, were generally small as a proportion of overall employment litigation costs. (In 2013, when the head of the Employment Section requested a report detailing this breakdown, all sales integrity cases over the previous year and a half had settled for less than a million dollars.) (04/10/2017 Wells Fargo Board Report at 73 and 74)

- In the course of the work of the task force, a manager in Internal Investigations prepared a report in August 2004 on "Gaming," regarding sales integrity violations and what Internal Investigations had learned about the subject. The report contained information about the scope of the sales practice issues at that time and observations about its causes and impacts. According to the report, "it is the conclusion by Corporate Security Internal Investigations" that "whether real or perceived, team members on the current Corporate Sales Incentive Plan feel they cannot make sales goals without gaming the system. The incentive to cheat is based on the fear of losing their jobs for not meeting performance expectations." The report warned of the reputational risks for Wells Fargo, specifically, "[i]f customers believe that Wells Fargo team members are not conducting business in an appropriate and ethical manner, it will result in loss of business and can lead to diminished reputation in the community." In that regard, the report noted that Wells Fargo had been losing unemployment insurance cases involving sales integrity terminations, in which judges "made disparaging comments" about the sales incentive system. The report conveyed the experience of two peer banks that had significantly reduced their sales incentive employee terminations after revising their sales incentive programs, and recommended that Wells Fargo consider similarly reducing or eliminating sales goals for employees and removing the threat of employee termination if goals were not met. (04/10/2017 Wells Fargo Board Report at 89)

79

194. In summary, the "Gaming" report warned that Wells Fargo employees had an "incentive to cheat" that was "based on the fear of losing their jobs." It said that workers felt they could not meet the bank's unrealistic sales goals "without gaming the system."

195. The "Gaming" report was sent to Wells Fargo's chief auditor, HR personnel and others. The Wells Fargo task force even cautioned that the bank faced "reputational risks" with customers and recommended management consider eliminating the sales goals.

196. But, like other warnings, this 2004 report fell on deaf ears inside Wells Fargo. "There is no evidence that the report and its recommendations were further escalated" (04/10/2017 Wells Fargo Board Report at 90). "Senior leaders were reluctant to take steps that they believed might have a negative impact on...financial performance," (04/10/2017 Wells Fargo Board Report at 5).

- Over time, even as senior regional leaders challenged and criticized the increasingly unrealistic sales goals — arguing that they generated sales of products that customers neither needed nor used — the Community Bank's senior management tolerated low quality accounts as a necessary by-product of a sales-driven organization. In particular, the Community Bank's senior leaders were concerned that tightening up too much on quality would risk lowering sales of products that customers actively used; and, more generally, the senior leaders were reluctant to take steps that they believed might have a negative impact on the Community Bank's financial performance. They also failed to adequately consider that low quality accounts could be indicative of unauthorized accounts. It was convenient instead to blame the problem of low quality and unauthorized accounts and other employee misconduct on individual wrongdoers and poor management in the field rather than on the Community Bank's sales model. (Report at 5)

197. Another warning sign that went unheeded from the August 2004 internal investigation report: Wells Fargo had been losing in court when it tried to deny unemployment benefits to employees fired for sales abuses. Incredibly, the judges who oversaw those cases were so appalled by what they saw that even they "made disparaging comments" about Wells Fargo's incentive system, according to the report. (Report at 89)

198. Yet it took a dozen years -- and a national firestorm coupled with Congressional hearings -- for Wells Fargo to finally eliminate those now-infamous sales goals in October of 2016.

199. The report shows a critical flaw in the type of "decentralized structure" that the bank believed in. Wells Fargo favored a management style that offered "strong deference" to the leaders of various business lines with lax checks and balances, the board investigation found. Wells Fargo even had a mantra to sum up this style of governance: "run it like you own it." (Report at 4)

200. On January 23, 2020, the OCC filed a Notice of Charges for Orders of Prohibition and Orders to Cease and Desist and Notice of Assessments of a Civil Money Penalty ("Notice").

201. On January 22, 2020, John Stumpf and the OCC entered into a "Consent Order" related to OCC's intent to initiate prohibition and civil money penalty proceedings against John Stumpf "pursuant to 12 U.S.C. § 1818(e) and (i) on the basis of Respondent's activities while serving as Chairman and Chief Executive Officer of Wells Fargo Bank, N.A., Sioux Falls, South Dakota"

202. In sworn testimony before the OCC, the Bank's former Chief Administrative Officer and Director of Human Resources agreed that employees sent letters, emails, and EthicsLine complaints about pressure and "gaming" for many years. (Notice at 11 ¶ 37)

203. The Bank's former Chief Administrative Officer and Director of Human Resources agreed in sworn testimony before the OCC that by 2016 she and the rest of the Operating Committee understood that employee complaints about "insane pressure to meet sales goals were, in fact, valid complaints that reflected what was actually going on in the Community Bank for many years." (Notice at 11 ¶ 38)

204. The Community Bank had a systemic and well-known problem with sales practices misconduct that persisted for at least 14 years, beginning no later than 2002. (Notice at 3 ¶ 3)

205. The root cause of the sales practices misconduct problem was the Community Bank's business model, which imposed intentionally unreasonable sales goals and unreasonable pressure on its employees to meet those goals and fostered an atmosphere that perpetuated improper and illegal conduct. Community Bank management intimidated and badgered employees to meet unattainable sales goals year after year, including by monitoring employees daily or hourly and

81

reporting their sales performance to their managers, subjecting employees to hazing-like abuse, and threatening to terminate and actually terminating employees for failure to meet the goals. (Notice at 3 ¶ 5)

206. The systemic sales practices misconduct persisted for years due to the failures of Bank senior executives and failures in the checks and balances that were supposed to be provided by the Law Department and Audit. The Law Department and Audit—that is, Respondents Strother, Julian, and McLinko-—had a responsibility to ensure incentive compensation plans were designed and operated in accordance with Bank policy, evaluate risk and ensure it was adequately managed and escalated, advise whether the Community Bank was operating in conformance with laws and regulations, or identify and detail significant or systemic problems in audit reports. None of the Respondents who held leadership roles in those departments adequately performed their responsibilities with respect to the sales practices misconduct problem. (Notice at 7 ¶ 16)

207. The sales practices misconduct problem and its root cause were well-known for years throughout the Bank. (Notice at 10 ¶ 29)

208. Employees often and consistently complained that the sales goals were unrealistic and unreasonable, but to no avail. (Notice at 10 ¶ 30)

209. For years, employees and customers tried in vain to alert senior leaders to the growing and continuing sales practices misconduct problem. (Notice at 10 ¶ 31)

210. From 2006 through 2014, total Ethics Line complaints received from employees increased year-over-year. (Notice at 10 ¶ 32)

211. Each year, nearly half of all EthicsLine cases investigated by Corporate Investigations related to employee sales integrity violations. a. The Bank's Sales Quality Manual defined sales integrity violations as "manipulations and/or misrepresentations of sales, service or referrals and reporting of sales, service or referrals in an attempt to receive compensation or to meet sales and service goals." (Notice at 10 ¶ 33)

212. In a September 2016 email, a senior Bank executive wrote: "I just read the 19 [EthicsLine] sales practice allegations, and at least 50 percent are exactly both pressure and greed related. It made my hair curl." (Notice at 10 ¶ 34)

82

213. As early as 2007, lack of customer consent was a primary allegation in Ethics Line complaints from employees. (Notice at 10 ¶ 35)

214. The Bank's former CEO agreed in testimony before the OCC that employees did all they could to complain about the unreasonable sales goals to Bank senior leadership in numerous ways over many years, by calling the EthicsLine, sending emails, holding protests, and approaching newspapers. He further stated that the senior leadership team, and not the employees, is to blame for the Bank not moving fast enough to address the sales practices misconduct problem.(Notice at 10 ¶ 36)

215. In sworn testimony before the OCC, the Bank's former Chief Administrative Officer and Director of Human Resources agreed that employees sent letters, emails, and EthicsLine complaints about pressure and "gaming" for many years. (Notice at 11 ¶ 37)

216. The Bank's former Chief Administrative Officer and Director of Human Resources agreed in sworn testimony before the OCC that by 2016 she and the rest of the Operating Committee, which included Respondents Strother and Julian, understood that employee complaints about "insane pressure to meet sales goals were, in fact, valid complaints that reflected what was actually going on in the Community Bank for many years." (Notice at 11 ¶ 38)

217. A 2010 employee complaint to Respondents Tolstedt and Strother explained: "Surely, you must be aware that you will reach a sales number to be achieved that will force the staff to cheat to obtain it. You have reached that point." The employee complaint proclaimed to Bank senior leadership, including Respondents Tolstedt and Strother: "[T]he noose around our necks ha[s] tightened: we have been told we must achieve the required solutions goals or [we] will be terminated. This type of practice guarantees high turnover, a managerial staff of bullying taskmasters, [and] bankers who are really financial molesters [and] cheaters . . . ." (Notice at 11 ¶ 39)

218. A 2012 employee complaint sent to Respondents Tolstedt and Strother explained: "When employees are required to meet unreasonable numbers, they are *forced* into inappropriate activity to keep their jobs. … Wells Fargo is playing a shell game – they are rewarding employees for fake accounts and will terminate them if they find out this is the case. Yet management will chastise and come very close to verbal abuse and put employees on written notice if they are

83

honest and do not open fake accounts to meet these unreasonable goals. The termination ax is suspended over our head one way or another; meet unreasonable goals or you will be terminated, cheat to meet the unreasonable goals and you will be terminated when caught. . . . I am NOT writing this letter to bring an investigation on my store, my district, my region – that is not where the root of the problem lies. It lies on upper management who has increased the goals to the 'must cheat to achieve' level." (emphasis in original). (Notice at 11 ¶ 40)

219. Another employee wrote to the CEO's office and to a senior leader in the Community Bank in 2013 that "I was in the 1991 Gulf War …. This is sad and hard for me to say, but I had less stress in the 1991 Gulf War than working for Wells Fargo." (Notice at 12 ¶ 41)

220. A 2013 employee complaint sent to Respondent Tolstedt explained employee sentiments: "Make your goals at any cost to the team member or customer – this is our environment. . . . I cant [sic] sleep at night or look in the mirror. Too much pressure, feels like we have to treat team members poorly or walk a very grey line to meet expectations." (Notice at 12 ¶ 42)

221. Customers also contacted senior leaders on many occasions. The Bank received tens of thousands of customer calls alleging lack of consent. a. From December 2013 through September 2015, the Bank received at least 5,000 customer complaints related to lack of consent. (Notice at 12 ¶ 43)

222. Customers and employees wrote letters and emails detailing the sales practices misconduct problem *to senior executives with the authority and responsibility to address it*. Nonetheless, the sales practices misconduct problem persisted because senior management, including Respondents, blamed individual employees for the problem, refused to address the actual root cause, downplayed the problem's seriousness and scope, and failed to provide accurate and complete reporting on the problem.  (Notice at 13 ¶ 47)

223. A report prepared by Corporate Investigations in 2004 ("2004 Investigation Report") identified instances of misconduct, in which employees were "gaming" the Community Bank's sales plan by, among other things, opening products without customer authorization and signing customers up for products they would never know about or use. The report found: "In almost every case [the employees] related they 'gamed' the system in order to preserve their employment

84

based on the fact they are expected to meet certain goals or lose their job." The 2004 Investigation Report recommended that the Bank remove the threat of employee termination if goals are not met. a. The 2004 Investigation Report found that between 2000 and 2004, gaming cases increased 979% and associated terminations had increased 962%. b. The 2004 Investigation Report also found that gaming cases were "geographically consistent corporate-wide." (Notice at 14 ¶ 52)

224. The sales practices misconduct problem as described in the 2004 Investigation Report existed at the Bank until the elimination of sales goals in the Community Bank in October 2016. (Notice at 14 ¶ 53)

225. In 2009, a manager in Corporate Investigations wrote: "[W]e have heard for years that the sales pressure is the cause [of sales practices misconduct], and I for one do not doubt it for a minute. A standard line we hear is 'I can play by the rules and get fired for not making unrealistic goals or I can cheat and hope I don't get caught'." (Notice at 14 ¶ 54)

226. Despite knowledge of the sales practices misconduct problem, its root cause, and its duration, there was great reluctance by senior management to make any meaningful changes to the business model because the Community Bank was tremendously profitable and central to the Bank's success. a. The CEO wrote: "The Community Bank is 'Rome' in our company—all roads lead to and from it." b. Between 2010 and 2016, approximately 55 to 60% of the Company's average annual profits were attributable to the Community Bank. (Notice at 15 ¶ 56)

227. A former Chief Security Officer of the Bank testified before the OCC that the sales practices misconduct problem persisted for as long as it did because "the [B]ank was very profitable and doing very well," and senior leadership perceived sales practices misconduct to involve few employee terminations and negligible loss to the Bank. (Notice at 15 ¶ 57)

228. All Respondents were well compensated over a period of years, with much of their compensation equity-based, and all profited personally from the improper business model. The Community Bank's unreasonably high sales goals and pressure increased the profitability and purported cross-sell success of the entire Bank, which directly increased their incentive compensation and equity awards. a. Respondent Tolstedt received millions of dollars annually in incentive compensation, based in part on the profitability of the Bank. Respondent Tolstedt's compensation awards explicitly took into account the Community Bank's achievement of record

85

cross-sell ratios. b. Respondents Russ Anderson, Strother, Julian, and McLinko also received significant annual incentive compensation based in part on the Bank's financial performance. (Notice at 15 ¶ 58)

229. The unlawful activities at the Community Bank were well-known for at least 14 years, throughout the bank, beginning no later than 2002.

230. Hundreds of thousands of employees in the Bank's largest line of business engaged in systemic illegal activity for 14 years. The Law Department allowed and enabled this systemic illegal activity to persist. (Notice at 76 ¶ 354)

231. The Bank had three lines of defense which, together with the Law Department, were tasked with controlling and managing risk. The Community Bank was the first line of defense. Corporate Risk was the second line of defense. Audit was the third line of defense. The Law Department often performed both first line and second line of defense activities. (Notice at 6 ¶ 10).

232. The most senior executives of the Bank were members of a group called the Operating Committee, which included the CEO and his direct reports, including Respondents Tolstedt, Strother, and Julian. (Notice at 6 ¶ 11).

233. During the OCC's investigation of the Bank's sales practices misconduct, the OCC subpoenaed each Respondent to testify. In sworn testimony before the OCC, Respondents Strother, Julian, and McLinko admitted that the Bank had a systemic sales practices misconduct problem rooted in the Community Bank's business model. (Notice at 6 ¶ 12).

234. In testimony before the OCC, Respondents Tolstedt and Russ Anderson asserted their Fifth Amendment right against self-incrimination and accordingly refused to answer all substantive questions about sales practices misconduct. (Notice at 6 ¶ 13).

235. In sworn testimony before the OCC, former CEO John Stumpf admitted, based on the information presented to him during his testimony, that the Community Bank had a systemic sales practices misconduct problem from the early 2000s until sales goals were eliminated in October of 2016. He further testified that Respondents Tolstedt and Russ Anderson bore "significant responsibility" for the existence and continuation of this problem. (Notice at 6 ¶ 14)

236. Specifically, former CEO Stumpf testified:

86

Q Okay. Is it fair to say that a systemic problem, as you understand the dictionary definition, means a problem that is inherent in the system, the business model of the company, and can only be corrected by changing the system or the business model of the company?

A I would agree with that statement.

Q Okay. Given that definition, do you believe that Wells Fargo Community Bank had a systemic problem with sales practice misconduct, from the early 2000s on until the time you eliminated sales goals in October of 2016?

A As I sit here today --

Q Yes, sir.

A -- considering the definition that I looked up and learning the things I've learned here the last few days, I would agree, it was a systemic problem in the Community Bank.

Q Okay, thank you. And if it is a systemic problem in the Community Bank, starting from the early 2000s up until September of 2016, wouldn't the head of the Community Bank, Ms. Tolstedt, bear a significant responsibility for the existence and the continuation of this systemic problem?

A I would agree with that.

Q And wouldn't Ms. Claudia Russ Anderson, the Group Risk Officer for the Community Bank, bear a significant responsibility for the existence and continuation of that problem?

A I would agree with that statement.

> United States of America, Department of the Treasury, Office of the Comptroller of the Currency. In the Matter of: Carrie Tolstedt, Former Head of the Community Bank; Claudia Russ Anderson, Former Community Bank Group Risk Officer; James Strother, Former General Counsel; David Julian, Former Chief Auditor; Paul McLinko, Former Executive Audit Director; Wells Fargo Bank, N.A., Sioux Falls, South Dakota. Notice of Charges for Orders of Prohibition and Orders to Cease and Desist and Notice of Assessments of a Civil Money Penalty. January 23, 2020. At 6 and 7 ¶ 15.

237. The systemic sales practices misconduct persisted for years due to the failures of Bank senior executives and failures in the checks and balances that were supposed to be provided by the Law Department and Audit. The Law Department and Audit—that is, Respondents Strother, Julian, and McLinko—had a responsibility to ensure incentive compensation plans were designed and operated in accordance with Bank policy, evaluate risk and ensure it was adequately managed

87

and escalated, advise whether the Community Bank was operating in conformance with laws and regulations, or identify and detail significant or systemic problems in audit reports. None of the Respondents who held leadership roles in those departments adequately performed their responsibilities with respect to the sales practices misconduct problem. (Notice at 7 ¶ 16)

238. Senior executives at the Bank acknowledge what was known or should have been known all along: that sales practices misconduct was a significant and systemic problem, and sales goals were unattainable and a significant part of the root cause of the sales practices. (Notice at 7 and 8 ¶ 17)

239. This article by MarketWatch is contrasting.



**MarketWatch**

## 10 SHOCKING PASSAGES FROM THE WELLS FARGO REPORT ON AGGRESSIVE SALES PRACTICES

By Steve Goldstein  Published: April 15, 2017 at 11:15 a.m. ET

'*This is not systemic*,' former CEO said in email.

88

Then–Wells Fargo Chairman and CEO John Stumpf testifies in
September 2016 before the House Financial Services Committee.

As Wells Fargo released a 113-page report Monday on a board committee's inquiry into the company's sales practices, the bank announced it has clawed back an additional $75 million in compensation from two top executives .

Wells Fargo <u>US:WFC clawed back an additional $28 million from the pay of former CEO John Stumpf and another $47 million's worth of stock options from Carrie Tolstedt,</u> who headed what was called the community bank. With the additional so-called clawbacks, it's taken back nearly $183 million from Stumpf, Tolstedt and other executives. Wells Fargo has been fined $185 million by regulators and been the subject of two congressional inquiries over practices including the unauthorized opening of millions of customer accounts.

Here are <u>selected passages from the report,</u> which the current CEO, Tim Sloan, said he accepted as part of a "journey to rebuild trust."

• Tolstedt and certain employees in her inner circle were insular and defensive and did not like to be challenged or hear negative information. Even senior leaders within the community-bank unit were frequently afraid of or discouraged from airing contrary views. Tolstedt effectively challenged and resisted scrutiny both from within and outside the unit. She and her group risk officer not only failed to escalate issues outside the community bank but also worked to impede such escalation, including by keeping from the board information regarding the number of employees terminated for sales-practice violations.

• Until as late as 2015, even as sales practices were labeled a "high risk" in materials provided to the board of directors' risk committee, there was a general perception within Wells Fargo's control functions that sales abuses were a problem of relatively modest significance, the equivalent of a tolerable number of minor infractions or victimless crimes. This underreaction to sales-practice issues resulted in part from the incorrect belief, extending well into 2015, that improper practices did not cause any "customer harm," a term that itself was narrowly construed to mean only financial harm such as fees and penalties. This flawed perspective made it easy to undervalue the risk to Wells Fargo's brand and reputation arising from the misuse of customer information and the breaches of trust occasioned by improper sales practices.

*'I really feel for Carrie and her team. We do such a good job in this area.'*

— Ex-CEO John Stumpf, in 2015, commenting on whether the bank had forced products on customers

89

• "Jump into January," a program created in 2003, aimed to motivate employees to "start the New Year strong by achieving and exceeding January goals." The community bank imposed higher daily sales targets on bankers in the month of January and emphasized and rewarded higher levels of sales activity. While many witnesses suggested that the initial impetus for the campaign was appropriate, witnesses almost universally agreed that the campaign was distorted over time and became a breeding ground for bad behavior that helped cement the sales culture's negative characteristics. Witnesses recalled that bankers were encouraged to make prospect lists comprising the names of friends and family members who were potential Jump into January sales targets and often would "sandbag" (temporarily withhold) December account openings until January in order to meet sales targets and incentives. The pressure associated with the campaign manifested itself in a higher incidence of low-quality accounts, as confirmed by the "Rolling Funding Rate," a quality metric used by the community-bank unit to track the rate at which its customers "fund" (place more than a *de minimis* amount into) new checking or savings accounts.

• Shelley Freeman, regional president in Los Angeles and later lead regional president in Florida, was particularly aggressive in her Jump into January campaigns. Witnesses described the practice of "running the gauntlet," in which district managers, dressed up in themed costumes, formed two lines. Each then ran between those lined toward a whiteboard on which he or she would report the number of sales achieved. Witnesses also stated that Freeman suggested to subordinates that they encourage customers to sign up for products regardless of need.

> *A branch manager had a teenage daughter with 24 accounts, an adult daughter with 18 accounts, a husband with 21 accounts, a brother with 14 accounts and a father with four accounts.*

— Finding on abuse of the bank's 'friends and family' accounts

• "Friends and family" accounts were also frequently referenced in the reviewed investigation records; employees often described opening accounts for family and friends in order to meet sales goals. For example, a branch manager had a teenage daughter with 24 accounts, an adult daughter with 18 accounts, a husband with 21 accounts, a brother with 14 accounts and a father with four accounts.

• In some reviewed records, employees entered fake customer phone numbers or substituted their own email addresses for those of customers to prevent Wells Fargo from contacting customers who might provide a less-than-perfect customer survey score. In one case, a branch manager falsified customer phone numbers and instructed her employees to do the same, leading to the deletion of at least 192 customer phone numbers, to circumvent customer polling.

90

• Regional leadership was unsuccessful in having concerns about secondary checking accounts addressed even as late as 2015. In that year, one regional leader wrote an email relating to removing secondary accounts from incentive compensation plans, saying he and other regional leaders should "fight the good fight every year — especially since I think one day we will be asked why it was part of the goal process to begin with."

• Group Risk Officer Claudia Russ Anderson minimized and obscured issues in reporting on the community bank, including sales practices. From late 2011, Russ Anderson challenged language in the corporate security portions of the reports to the bank's Audit & Examination Committee. In one email exchange in 2012, Michael Bacon, the head of corporate security and responsible for internal investigations, stated that Russ Anderson "often challenge[d] the Audit and CS A&E reporting verbiage," but that at that point he had "gotten good with the credible challenge" in response. Bacon noted that "our data continues to highlight a concerning trend in the area of Sales Integrity — from the increase in EthicsLine reports, to the increase in executive complaint letters," and "increases in confirmed fraud, thus, we need to continue to escalate this issue with senior leadership." Russ Anderson told him that his reporting made the problem sound "so much worse than it is."

• Ironically, in a 2004 email to Stumpf, Tolstedt acknowledged the importance of setting compensation plans such that they create incentives for appropriate behavior. Specifically, she noted: "I think you have to balance cross sell with the right incentive plan and other measures so that you ensure you have quality cross sell. Many banks ... build products that encourage the wrong sales behavior. They encourage their sales force to sell a second account free, multiple savings accounts free, etc. Then if you incent a team of bankers on top of that around sales per day alone you are asking for trouble." Tolstedt acknowledged the need to balance cross-selling, household penetration and household profitability measures, and to have a balanced incentive plan based on units and profit. "If you look at one metric alone and don't build an integrated model, you are asking for low value, unfunded bad cross sell that will not add up to revenue growth or retention."

• Even in 2015 and 2016, Stumpf did not appreciate the scope and severity of the problem. He continued to publicly support the appropriateness of Wells Fargo's sales goals and to highlight that the vast majority of Wells Fargo employees "got it right." An example is an email Stumpf wrote to Sloan on May 17, 2015, after the filing of the Los Angeles city attorney's lawsuit: "I have worked over the weekend with Carrie on the LA issue — I really feel for Carrie and her team. We do such a good job in this area. I will fight this one to the finish. Do you know only around 1% of our people lose their jobs [for] gaming the system, and about 2/3 of those are for gaming the monitoring of the system, i.e. changing phone numbers, etc. Nothing could be further from the truth on forcing products on customers. In any case, right will win and we are right. Did some do things wrong — you bet and that is called life. This is not systemic."

COMPLAINT
Case No.

1    10 shocking passages from the Wells Fargo report on aggressive sales practices -
2    MarketWatch

3    https://www.marketwatch.com/story/10-shocking-passages-from-the-wells-fargo-
     report-on-aggressive-sales-practices-2017-04-10
4

5

6        240. This analysis by the Global Financial Markets Center of Duke University School of
     Law is instructive.
7



The FinReg Blog
Global Financial Markets Center
Duke University School of Law

**WELLS FARGO UNAUTHORIZED ACCOUNT OPENINGS: A CASE STUDY
FOR BANK BOARD DIRECTORS**

*Posted on April 26, 2017 by Joseph A. Smith, Jr. and Lee Reiners*
Courtesy of Joseph A. Smith Jr. and Lee Reiners

*This case study draws primarily – and in some instances quotes verbatim – from the 113
page report of the Wells Fargo board's independent investigation of retail banking sales
practices. The case study also relies on the Office of the Comptroller of the Currency's
report titled: Lessons Learned Review Of Supervision Of Sales Practices At Wells
Fargo. Additional details are sourced from various Wells Fargo regulatory reports. The
case study is intended to be used as a resource for directors at banks and financial services
institutions of all sizes, so that they may learn from, and hopefully avoid, mistakes that
were made over many years throughout Wells Fargo's corporate hierarchy. All errors are
our own.*

**CASE STUDY: Wells Fargo Fraudulent Accounts Scandal**

92

Wells Fargo Bank, N.A. ("WFBNA") is a nationally-chartered bank subject to federal regulatory oversight and examination, including by the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Company ("FDIC"), and the Consumer Financial Protection Bureau ("CFPB"). WFBNA is an indirect, wholly-owned subsidiary of Wells Fargo & Company ("WFC"), a financial holding company and a bank holding company ("BHC"), subject to Federal Reserve regulatory and supervisory authority. Combined, WFBNA and WFC constitute Wells Fargo.

Product of a storied tradition and history of industry-leading operating excellence, Wells Fargo has run into trouble. Wells Fargo's board and management now face the daunting task of how to deal with the Bank's current difficulties.

### Background

Wells Fargo was founded during the California Gold Rush of the 19th Century. For more than a century, the Bank epitomized safety, soundness, and the frontier spirit, and developed a solid business and commercial franchise that centered in the western United States. To extend that franchise, Wells Fargo merged in 1998 with Norwest Corporation (Norwest), a Midwestern banking organization that excelled in business, commercial and retail markets, and began a geographic expansion with the goal of being a truly national bank.

While the merged bank operated under the Wells Fargo name, it was clear from the start that Norwest's management culture, and personnel, were directing the combined firm. Under the post-merger regime, a number of operating principles were foundational:

- The Bank is a business with the objective of generating double digit revenue and income growth every year.

- The Bank operates on a decentralized model, with business heads encouraged to "run it like you own it."

- The Bank's relationship with customers is a business relationship in which the Bank's obligation is to provide services the client needs efficiently and profitably. While the Bank's treatment of customers must be fair, such treatment is in the Bank's interest and an aspect of overall top-quality customer service.

- That which can't be measured can't be managed and, accordingly, the Bank instituted a rigorous performance management system based on the achievement of obsessively measured performance metrics.

- Acceptable customer profitability could not be achieved unless and until the customer was receiving multiple services and would not be optimal until the customer had eight or more services.

93

COMPLAINT
Case No.

- ○ Based on the operating principle just mentioned, the Bank (and the other financial services operations that were held by WFC) was infused with a sales culture that vigorously promoted the cross-selling of services. Opening of new customer accounts was rigorously tracked by Wells Fargo's operating systems; success was rewarded with bonuses; lack of success with "enhanced training" or termination.

As a result of its core retail focus and management discipline, Wells Fargo weathered the ups and downs of the 1980's and 1990's better than most of its competitors. It was in a particularly strong position at the onset of the financial crisis, which enabled Wells Fargo, in 2008, to acquire Wachovia Corporation, a revered name in banking that had fallen on hard times as the result of loose lending and improvident acquisitions, including the indirect acquisition of Golden West Financial Corp. (Golden West), parent company of World Savings Bank, a large savings and loan that had financed the acquisition of California residential real estate at astronomical (and ultimately illusory) prices.

Wells Fargo had ups and downs during the Financial Crisis. While it sought to decline TARP infusions of capital, Wells Fargo's management was ultimately persuaded to accept TARP funds after frank and fair exchanges of views with the Treasury Department and the Office of Comptroller of the Currency (OCC), its primary federal regulator. Its residential mortgage lending activities (much of which came from the Golden West acquisition) resulted in threatened litigation by state and federal agencies, and a burdensome and expensive settlement.

Wells Fargo's basic business remained sound, and it came through the crisis relatively unscathed. It paid back the TARP money, weathered the settlement, and came out of the crisis in a relatively strong financial position. It had a national franchise, a proven business model, and strong capital. It was a stock market favorite whose largest shareholder was the legendary investor Warren Buffett. Its prospects looked bright.

Then something strange happened.

## Wells Fargo's Identity Crisis

The core of Wells Fargo's operating strategy was its large retail distribution network, operating out of the Community Bank Division, and comprised of physical branches (called "stores"), and alternative delivery channels such as telephone, free-standing ATMs, and the internet. As noted above, the objective of this system was to generate new customer relationships and to expand, to the maximum extent possible, the number of products and services sold to existing customers. The scale of the system had grown by acquisition, but Wells Fargo's management had insured that its IT systems expanded to cover this growth effectively. While the Community Bank's management had also grown, it was well-trained in the Bank's management philosophy and in the use of the Bank's systems. This cohesion was buttressed by the fact that the top leadership had worked together for years at Norwest and, as a result, had implicit trust and confidence in each other.

94

Wells Fargo's financial success reinforced its commitment to a decentralized organizational structure, and enhanced the status and authority of division heads, particularly the head of the Community Bank, which was the Bank's main profit engine. The decentralized model also influenced the design and execution of the firm's control functions. Many of the Bank's centralized control functions had parallel units in the lines of business, with dual lines of reporting. For instance, each line of business had its own chief risk officer who reported directly to the head of the business line, and had a secondary (dotted line) reporting line to the head of Corporate Risk – the Chief Risk Officer. A similar decentralized structure existed for Human Resources.

The Bank's decentralized structure gave the head of the Community Bank near unlimited discretion in establishing sales goals, and management at all levels were remorseless and relentless in pursuit of these goals. The Community Bank's leadership acknowledged the improbability of reaching these goals, referring to them at times as 50/50 plans, meaning that they expected only half the regions would be able to meet them. Nonetheless, at each level in the hierarchy, employees were measured on how they performed relative to these goals. They were ranked against one another on their performance relative to goals, and their incentive compensation and promotional opportunities were determined relative to those goals. In some cases, employees were dismissed for failing to meet sales goals. Turnover in the Community Bank was high relative to peers, but because of the sales culture, management considered this turnover to be in line with that of non-bank retailers, and therefore acceptable.

Over the years, signs did emerge that aggressive sales goals were having some deleterious effects:

- In 2002, the Community Bank, noticing an uptick in sales practice violations, established a sales integrity task force which lead to additional employee training and a modification of incentive plans to reduce the promotion of bad behavior.

- In the summer of 2002, Wells Fargo's Internal Investigations unit determined that almost an entire branch in Colorado engaged in a form of "gaming" in connection with a promotional campaign in the second quarter of 2002. In some instances, such "gaming" involved employees issuing debit cards without customer consent.

- In 2004, Wells Fargo's Internal Investigations group drafted a memorandum noting an increase in annual sales gaming cases — defined as the manipulation and/or misrepresentation of sales to receive compensation or meet sales goals — from 63 in 2000 to a projected 680 in 2004. The memorandum noted a similar increase in terminations, from 21 in 2000 to a projected 223 in 2004.

- Beginning in 2005, the Wells Fargo board of director's Audit & Examination Committee began receiving regular Audit & Security Reports indicating that the highest level of complaints to the firm's internal EthicsLine were related to sales integrity violations.

95

COMPLAINT
Case No.

- In 2010, Wells Fargo's primary regulator, the OCC, issued a Matter Requiring Attention (MRA) requiring an enterprise-wide system for complaint management. This MRA was addressed to the firm's management and not to the board.

- Also in 2010, OCC examiners asked the head of the Community Bank about the 700 cases of whistleblower complaints related to the gaming of employee incentive plans. The head of the Community Bank responded that the primary reason for the high number of complaints is that the culture encourages valid complaints which are then investigated and appropriately addressed.

- In 2011, Wells Fargo terminated 13 bankers and tellers in a branch in California for engaging in the manipulation of teller referral credits.

Despite these warning signs, the incentive compensation structure within the Community Bank remained largely unchanged. In fact, the Division doubled down on the program in 2010 by aligning performance management and recognition with sales goals, so that incentive compensation and performance rating were both associated with sales. This effectively meant that bankers, branch managers and district managers who did not meet sales goals not only could miss out on opportunities to earn incentive compensation, but were also at risk of poor performance reviews.

### Questions

1. Do you agree with the premise of Wells Fargo's operating philosophy that a banking organization is a business like any other? Are financial firms different, and, if so, how?

2. If you were on Wells Fargo's board, would you have expressed concern about the control environment and the firm's culture?

3. How are board members supposed to get an accurate picture of Wells Fargo's culture?

4. Should profitability have any influence over how a board responds to potential issues arising from a firm's culture or control environment?

### Wells Fargo's Board of Directors

Wells Fargo has a 15-member board of directors, comprised of intelligent and accomplished people from a variety of backgrounds. Until December of 2016, the offices of board chair and CEO were held by the same individual, a full-time executive of the firm. The remaining board members were independent and, through 2016, were led by a lead independent director. Nine of the independent directors had been in place for at least

96

five years, with the remaining five independent directors having anywhere from one to four years of experience on the board. Six of the independent directors had experience in financial management or financial services according to Wells Fargo's 2015 proxy statement. Each board member is elected to a one-year term and is eligible for reelection at the annual shareholders meeting. In 2014, nine of Wells Fargo's independent directors served on three or more public company boards, as shown in Table 1 below.

| Table 1: Wells Fargo & Co. Independent Directors (2014) | | | |
|---|---|---|---|
| **Director** | **Board Role** | **Executive Employment** | **Other Public Company Board Seats** |
| John D. Baker II | | | Patriot Transportation Holding, Inc.; Texas Industries, Inc. |
| Elaine L. Chao | | | News Corp.; Protective Life Corp. |
| John S. Chen | | CEO, BlackBerry Ltd. | BlackBerry Ltd.; The Walt Disney Co. |
| Lloyd H. Dean | Chair, Human Resources Committee | CEO, Dignity Health | Cytori Therapeutics, Inc.; Premier, Inc. |
| Susan E. Engel | | | |
| Enrique Hernandez | Chair, Risk and Finance Committees | CEO, Inter-Con Security Systems, Inc. | Chevron Corp.; McDonald's Corp.; Nordstrom, Inc. |
| Donald M. James | | CEO, Vulcan Materials Co. | Vulcan Materials Co.; Southern Co. |
| Cynthia H. Milligan | Chair, Credit Committee | | Calvert Funds; Kellogg Co.; Raven Industries, Inc. |
| Federico F. Pena | | | Sonic Corp. |
| James H. Quigley | Chair, Audit Committee | | Hess Corp.; Merrimack Pharmaceuticals, Inc. |
| Judith M. Runstad | Chair, Corporate Responsibility Committee | | |
| Stephen W. Sanger | Lead Independent Director | | Pfizer, Inc. |
| Susan G. Swenson | | | Harmonic, Inc.; Novatel Wireless, Inc.; Spirent Communications plc |

*Note.* Reprinted from Kress, Jeremy C., *Board to Death: How Busy Directors Could Cause the Next Financial Crisis* (June 22, 2017). 59 B.C. L. Rev. ___ (2018 Forthcoming); Ross School of Business Paper No. 1370. Available at SSRN: https://ssrn.com/abstract=2991142

Committees of the board include the: Risk Committee, Audit & Examination Committee (A&E), Credit Committee, Corporate Responsibility Committee, Human Resources Committee, Finance Committee, and Governance & Nominating Committee. According to Wells Fargo's 2015 Annual Report on Form 10-K, each board committee "works closely with management to understand and oversee the Company's key risk exposures." The Risk Committee serves a unique role, as it is designed to assist the board's other standing committees as "they consider their specific risk issues." From the 10K:

COMPLAINT
Case No.

"The Risk Committee includes the chairs of each of the board's other standing committees so that it does not duplicate the risk oversight efforts of other board committees and to provide it with a comprehensive perspective on risk across the Company and across all individual risk types."

"In addition to providing a forum for risk issues at the board level, the Risk Committee provides oversight of the Company's Corporate Risk function and plays an active role in approving and overseeing the Company's enterprise-wide risk management framework established by management to manage risk, and the functional framework and oversight policies established by management for each key risk type."

The Audit & Examination Committee also plays a critical role in establishing and maintaining the firm's risk management framework beyond selecting and evaluating the firm's outside auditors. The A&E Committee oversees the firm's legal and regulatory compliance, reviews regulatory examination reports, and oversees operational risk.

As indicated in Table 2 below, Wells Fargo's board, as well as the risk and audit committees, meet less frequently than those of other large banking organizations that comprise Wells Fargo's peer group.

| Table 2: Number of Board and Committee Meetings | | | | | |
|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 |
| **Full Board** | | | | | |
| Wells Fargo | 13 | 9 | 9 | 9 | 9 |
| Peer Banks | 14.9 | 14.1 | 13.7 | 16.6 | 15.3 |
| | | | | | |
| **Risk Committee** | | | | | |
| Wells Fargo | 4 | 4 | 6 | 6 | 7 |
| Peer Banks | 8.3 | 8.3 | 8.4 | 10.3 | 9.6 |
| | | | | | |
| **Audit Committee** | | | | | |
| Wells Fargo | 9 | 9 | 9 | 10 | 14 |
| Peer Banks | 14.1 | 14.1 | 14.9 | 15.6 | 15.6 |

*Note.* Reprinted from Kress, Jeremy C., *Board to Death: How Busy Directors Could Cause the Next Financial Crisis* (June 22, 2017). 59 B.C. L. Rev. ___ (2018 Forthcoming); Ross School of Business Paper No. 1370. Available at SSRN: https://ssrn.com/abstract=2991142

Wells Fargo's sales practices became a public issue in December 2013, when the Los Angeles Times published a report that customers of Wells Fargo in the area were reporting receipt of account statements for accounts of which they had no knowledge. Worse, some

98

of these account statements assessed fees and charges for activities in which the statement recipients had not engaged. Aggrieved customers complained to Wells Fargo and, getting little or nothing, went to the local District Attorney, the State Attorney General, and the Bank's regulators.

Wells Fargo's board felt blindsided by the allegations contained in the *LA Times* report. Prior to the report, sales practice issues had not been previously flagged as a noteworthy risk to the full board or any committee of the board. Sales conduct or "gaming" issues had previously been mentioned in two sections of the quarterly packet for the A&E Committee, however they were not flagged as a noteworthy risk.

Questions

1. Do you have concerns about the number of external engagements Wells Fargo's board members have? If yes, why?

2. Upon reading the *LA Times* story, what actions should Wells Fargo's board of directors take?

3. Should there be a materiality threshold before the board expects to be informed about a potential problem?

Post-*LA Times* Story

After the *LA Times* report, the chair of the board's Risk Committee instructed Wells Fargo's Chief Risk Officer (CRO) to take the lead in addressing the sales practice issues and to keep the Risk Committee informed of Corporate Risk's efforts. Sales practices and the cross-sell strategy were identified as a noteworthy risk issue to the Risk Committee and the full board for the first time in February 2014, but they were not mentioned in the Executive Summary, which covers the most important enterprise risks. That same month, the HR director and the CRO reported to the board's Human Resources Committee that action plans were in place to address the issue and that further monitoring of sales practices was warranted. However, they also reported that they did not feel it was necessary to adjust executive compensation for the 2013 cycle for sales integrity matters, a recommendation which the board followed.

At the full board meeting in April 2014, the CRO reported that sales practices had now become a current focus for the Corporate Risk Division, and at the August Risk Committee meeting, the CRO and CEO reiterated Wells Fargo's focus on ensuring its cross-sell strategies were consistent with the development of long-term customer relationships.

Throughout 2014, the board and Risk Committee received assurances from the Corporate Risk Division, the Community Bank, and HR that sales practice issues were the subject of heightened attention, that the control environment was operating effectively, and that the situation was improving. Because of perceived improvements, in February 2015, the

99

COMPLAINT
Case No.

Noteworthy Risk Issues report reduced sales conduct from High to Medium risk, stating that management was "build[ing] out additional second line of defense oversight of Sales Practices." Also in February, the Audit Function reported that no issues were found in its audits of Wells Fargo's sales practices and cross-sell, which were rated effective with no reportable issues. That same month, the Human Resources Director and the CRO advised the Human Resources Committee that the Community Bank had taken appropriate actions to address sales integrity issues, and therefore, there was no need to adjust downward executive compensation for the 2014 performance cycle.

In April of 2015, the head of the Community Bank addressed the Risk Committee for the first time. She discussed the improvements in risk management that had been made in the Community Bank and reiterated her view that the problem was a result of a few bad apples, and not a reflection of a broader cultural problem within the Community Bank.

In May of 2015, the Los Angeles City Attorney filed a lawsuit against Wells Fargo based on the Bank's alleged fraudulent and abusive sales practices.

Post-Lawsuit

After the lawsuit was filed, the chair of the Risk Committee demanded a presentation concerning the issues alleged in the lawsuit and the broader context of sales practices at Wells Fargo. An early draft of the presentation – which was never delivered to the Committee – disclosed that approximately 1% of employees in the Community Bank had been terminated for sales integrity violations in 2013 and 2014. After the Community Bank's management questioned the validity of this number, it was removed from the final presentation that was delivered to the Risk Committee. Instead, during the May 2015 Risk Committee meeting, the head of the Community Bank informed the committee that in 2013 and 2014 combined, 230 employees had been terminated for sales abuses, and that 70% of these employees had been terminated for intentionally inputting incorrect customer phone numbers into the systems, while the remaining 30% were terminated for improperly funding unauthorized customer accounts from authorized accounts. The Risk Committee was surprised by the presentation and considered the 230 number to be high. Some managers within Wells Fargo knew the actual number to be much higher. The head of Wells Fargo's Internal Investigations Division, who reported to the head of Corporate Security, had lobbied for the presentation to cite 2,500 employee terminations for sales practice issues in 2013 and 2014. The head of the Community Bank, along with the Community Bank's CRO, vigorously pushed back against these figures which were ultimately left out of the presentation.

At the full board meeting in June, the CRO – who was away on vacation during the May Risk Committee meeting – informed the board that Corporate Risk would be conducting a comprehensive review of the Bank's sales practices and that a third-party consulting firm would also be brought in to conduct an independent review of Wells Fargo's training, compensation, and sales practices.

COMPLAINT
Case No.